**STATE of Iowa, Appellee,**

v.

**Steven Joseph PETERSON, Appellant.**

No. 00–1318.

Supreme Court of Iowa.

June 11, 2003.

Linda Del Gallo, State Appellate Defender, and Dennis D. Hendrickson, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Cristen C. Odell, Assistant Attorney General, Thomas J. Ferguson, County Attorney, and D. Raymond Walton, Assistant County Attorney, for appellee.

LAVORATO, Chief Justice.

A jury convicted Steven Joseph Peterson of first-degree murder. He appealed his conviction, judgment, and sentence, contending the district court erred in refusing to suppress statements he made to law enforcement officers. We transferred the case to the court of appeals, which held that the district court should have sup-

pressed the statements, but that any error in admitting them was harmless beyond a reasonable doubt. We granted Peterson's application for further review. Our de novo review of the record leads us to conclude that the district court should have suppressed the statements and the erroneous admission of those statements was not harmless beyond a reasonable doubt. We therefore vacate the court of appeals decision, reverse the district court judgment, and remand the case for a new trial.

## I. Background Facts and Proceedings.

Howard Smith, an elderly gentleman who lived alone, loved people. Children in particular would frequent his home; he kept pop and candy for them. Ruben Howard, Jessie Billington, Peterson, and others often took advantage of Smith's generosity and stole from him.

About two months before Smith was found stabbed to death in his home, Peterson, Billington and several of their friends stole Smith's car. Peterson confessed to the theft, pled guilty, and was imprisoned at the Newton Correctional Facility sometime after Smith's death. Billington also admitted to stealing Smith's car, and was also imprisoned at some point. However, the record is not clear as to whether Billington was imprisoned for the theft.

Eventually, the State charged Peterson with first-degree murder in connection with Smith's death. Detectives Moller and Holms of the Waterloo Police Department drove to the Newton Correctional Facility to arrest Peterson pursuant to an arrest warrant on the charge.

Moller had advised prison authorities that he was coming to serve Peterson with the warrant. When the two detectives arrived at the prison, Correctional Officer Holder escorted Peterson from Peterson's work area to a small room segregated from the general prison population. Holder remained on guard outside the room.

Moller attempted to interview Peterson about Smith's death without first telling Peterson about the charge and the warrant and advising him of his rights. Peterson stood up and denied any involvement with the death. Moller asked Peterson to sit down and talk to him for just a minute. Peterson sat down, at which point Moller told Peterson that they had talked to quite a few people. Peterson again denied that he had killed Smith and announced he would not talk any further without an attorney.

Instead of terminating the interview, Moller continued talking, informing Peterson that he had learned some things. Moller told Peterson he knew that Ruben Howard, Billington, and he—Peterson— had gone to Smith's home to get some money, something had gone wrong, and Smith had been killed. At this point, Peterson asked what everyone was saying about him. Moller refused to go into details. Peterson again denied that he had killed Smith. Detective Holms then said to Moller, "just go ahead and arrest him on the warrant and let's get going." Moller responded by advising Peterson he was under arrest for the murder of Smith.

Peterson then asked about the penalties for murder and Moller told him that first-degree murder carries a life sentence. Peterson stood up and said, "Let's go," at which point Moller responded, "Well, I'd still maybe like to talk to you more about this." Peterson said, "Well maybe when we get back to Waterloo, I'll talk to you."

Correctional Officer Holder then accompanied Peterson to his cell so Peterson could retrieve his belongings. While the two were crossing the prison yard, an inmate yelled at Peterson, wanting to know what was going on. Peterson responded

that he was going to be charged with first-degree murder. Holder asked Peterson what he thought about that, to which Peterson responded that he did not remember anything because he had been using methamphetamine for a month. After Peterson retrieved his belongings, Holder escorted him back to the two detectives. Holder told the detectives about his conversation with Peterson.

The detectives put Peterson in the back seat of their car. At this point, Peterson was in restraints. Moller sat in the back seat with Peterson while Holms drove. The officers engaged Peterson in some small talk about prison life.

Holms asked Peterson whether drugs were available in prison. Peterson denied using drugs in prison but did make a statement similar to what he had said to Holder about using methamphetamine "back then" and not remembering anything. At this point Moller told Peterson that he would like to talk to him more but would first need to have him sign a waiver of his *Miranda* rights. Peterson signed the waiver form and began talking with Moller about the case.

When the detectives and Peterson arrived at the Waterloo Police Station, Moller took a typewritten statement from Peterson, which Peterson signed. Peterson also provided an oral videotaped statement. In his statement, Peterson described the killing this way:

> One night in November of 1997, I was at Lindsey Owen's place.... Jesse Billington and Ruben Howard stopped by and asked if I wanted to go to Howard Smith's house. They said they wanted to go there and get some money. I said I would go with them.
>
> I know that when Jesse said he wanted to go get some money, he meant we would distract Howard, and get money from his wallet. Jesse and I have gone

to Howard's place and done this six or seven times, if not more.

> . . . .

> Howard [Smith] came to the door and opened it and told us to come in. Howard walked back into the living room and sat down in the same chair as he was before. We followed him. By then Howard figured out who I was. He said, "I know you," to me, and stood up. He then started getting into my face, calling me a mother f—— and a thief. He was pointing his finger in my face, and getting loud. The[n] he pushed me with both his hands into my chest. He did this twice. He pushed me hard enough that I had to step backwards about three steps.
>
> I can't really remember what happened next. I know I was really mad, on a scale of one thru ten, I was a twelve. I know that because I was this mad, what happened next is a blank. The next thing I remember is seeing Howard on the floor in front of me. How or why he was on the floor I don't remember.
>
> I then noticed there was a knife in my right hand. It was my knife. I don't remember exactly what I did with the knife. Jesse and Ruben were upset over what just happened. Jesse and Ruben then started arguing about what the hell to do. We were all getting loud. Jesse said we should put Howard in bed.

Peterson went on to describe moving the body to the bed and the three of them stealing various items from Smith's home.

Peterson moved to suppress all his statements to the two detectives at the prison facility and on the trip to the Waterloo Police Station, as well as his statement to Correctional Officer Holder and the statements he gave at the police station. District Judge Jon Fister denied the motion. At trial, District Judge George L.

Stigler admitted the statements into evidence and the jury found Peterson guilty of first-degree murder. The district court sentenced Peterson to life imprisonment. Peterson appealed.

On appeal, Peterson contended the statements he made to law enforcement officers on the day of his arrest were obtained in violation of his Fifth, Sixth, and Fourteenth Amendment rights and should have been suppressed. We transferred the case to the court of appeals. The court of appeals concluded the district court should have suppressed Peterson's statements because they were obtained in violation of his Fifth, Sixth, and Fourteenth Amendment rights. However, the court of appeals concluded that any error in the statements' admission was harmless beyond a reasonable doubt. We granted Peterson's application for further review.

We recite additional facts as they relate to the issues presented.

**II. Scope of Review.**

■ We review constitutional issues de novo. *State v. Biddle,* 652 N.W.2d 191, 200 (Iowa 2002).

**III. Alleged Constitutional Violations.**

■ **A. Fifth Amendment.** The Fifth Amendment to the federal constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Due Process Clause of the Fourteenth Amendment to the federal constitution makes this right against self-incrimination binding on the states. *Malloy v. Hogan,* 378 U.S. 1, 6, 84 S.Ct. 1489, 1492, 12 L.Ed.2d 653, 658 (1964). Pursuant to the Fifth Amendment, a person questioned by the police after being "taken into custody or otherwise deprived of his freedom of action in any significant way" must first be

warned that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706–07 (1966).

■ Once the warnings have been given, *Miranda* makes very clear the subsequent procedure:

> If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation *must cease.* At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, *subtle or otherwise.* Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation *must cease* until an attorney is present.

*Id.* at 473–74, 86 S.Ct. at 1627–28, 16 L.Ed.2d at 723 (footnote omitted) (emphasis added). "The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be *interrogated. Id.* at 478, 86 S.Ct. at 1630, 16 L.Ed.2d at 726 (emphasis added). By interrogation, the Court meant "*questioning initiated* by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706 (emphasis added).

 Only after the *Miranda* warnings regarding the accused's rights have been given and an opportunity throughout the interrogation has been afforded the accused to exercise these rights, can the accused knowingly and intelligently waive the rights and answer questions. *Id.* at 478–79, 86 S.Ct. at 1630, 16 L.Ed.2d at 726. And the State has a heavy burden to establish the waiver. *Id.* at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724. Absent the warnings regarding the accused's rights and a showing by the prosecution that the defendant knowingly and intelligently waived those rights, no evidence obtained as a result of interrogation can be used against the defendant. *Id.* at 479, 86 S.Ct. at 1630, 16 L.Ed.2d at 726.

In *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Court recognized that in *Miranda* it held that once an accused in custody asks to speak with a lawyer, all interrogation must cease until a lawyer is present. *Innis*, 446 U.S. at 293, 100 S.Ct. at 1686, 64 L.Ed.2d at 303. The question posed in *Innis* was whether the accused had been "interrogated" in violation of the standards promulgated in *Miranda*. *Id.*

In *Innis*, the Court began its analysis by noting that the defendant had been informed of his *Miranda* rights, that he invoked his *Miranda* right to counsel, and that he was in custody. *Id.* at 298, 100 S.Ct. at 1688, 64 L.Ed.2d at 306. The issue boiled down to whether the defendant was "interrogated" in violation of his *Miranda* right to remain silent until he had consulted with a lawyer. *Id.* To resolve this issue, the Court recognized it first had to define "interrogation" under *Miranda*. *Id.*

The Court's starting point for such a definition was the following language from *Miranda:* "By custodial interrogation, we mean *questioning* initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* (quoting *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706 (emphasis added)). The Court refused to construe this language narrowly to include only express questioning, noting that the concern of the Court in *Miranda* was that the " 'interrogation environment' created by the interplay of interrogation and custody would 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination." *Id.* at 298–99, 100 S.Ct. at 1688, 64 L.Ed.2d at 306 (citation omitted). Additionally, the Court noted that the police practices that evoked this concern and that were mentioned in *Miranda* did not involve express questioning. *Id.* at 299, 100 S.Ct. at 1688–89, 64 L.Ed.2d at 306. Finally, the Court observed that to limit *Miranda* to express questioning would " 'place a premium on the ingenuity of the police to devise methods of indirect interrogation, rather than to implement the plain mandate of *Miranda*.' " *Id.* at 299 n. 3, 100 S.Ct. at 1689 n. 3, 64 L.Ed.2d at 307 n. 3 (citation omitted).

The Court then announced its meaning of custodial interrogation:

We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Id.* at 300–01, 100 S.Ct. at 1689–90, 64 L.Ed.2d at 307–08.

The "reasonably likely to elicit an incriminating response from the suspect" language

> focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Id.* at 301–02, 100 S.Ct. at 1690, 64 L.Ed.2d at 308 (footnotes omitted).

However,

> [t]his is not to say that the intent of the police is irrelevant, for it may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response. In particular, where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect.

*Id.* at 301 n. 7, 100 S.Ct. at 1690 n. 7, 64 L.Ed.2d at 308 n. 7. The incriminating response referred to includes "any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial." *Id.* at 301 n. 5, 100 S.Ct. at 1690 n. 5, 64 L.Ed.2d at 308 n. 5.

The Court in *Edwards v. Arizona,* noted that "*Miranda* itself indicated that the assertion of the right to counsel was a significant event and that once exercised by the accused, 'the interrogation must cease until an attorney is present.'" 451 U.S. 477, 485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378, 386 (1981) (quoting *Miranda,* 384 U.S. at 474, 86 S.Ct. at 1627, 16 L.Ed.2d at 723). Building on that holding, the *Edwards* Court held that once an accused invokes the right to have counsel present during custodial interrogation, the prosecution cannot establish a valid waiver of that right by showing that the accused responded to further police-initiated custodial interrogation even if the accused has been advised of his or her rights. *Id.* at 484, 101 S.Ct. at 1884–85, 68 L.Ed.2d at 386. Announcing a bright-line rule, the Court said: "[A]n accused ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484–85, 101 S.Ct. at 1885, 68 L.Ed.2d at 386. Statements obtained in contravention of this bright-line rule violate the accused's Fifth and Fourteenth Amendment rights to have counsel present during custodial interrogation and for that reason are inadmissible. *Id.* at 487, 101 S.Ct. at 1886, 68 L.Ed.2d at 387–88.

One writer explains the rationale of *Edwards* this way:

> *Edwards v. Arizona* illustrates how a prophylactic ruling may shield a constitutional right simply by forbidding an activity which presents a substantial potential for invading that right. *Edwards* holds that when a suspect responds to *Miranda* warnings by requesting the assistance of counsel, police may not thereafter reinitiate interrogation while the

suspect remains in custody, even when the interrogation is renewed only after the passage of a significant period of time.... Any statement obtained from the suspect in response to police initiation of interrogation in violation of *Edwards* is rendered inadmissible in the prosecution case-in-chief.

1 Wayne R. LaFave, et al., *Criminal Procedure* § 2.9(e), at 677 (2d ed.1999) (footnotes omitted); *see also Solem v. Stumes*, 465 U.S. 638, 641, 646, 104 S.Ct. 1338, 1340, 1343, 79 L.Ed.2d 579, 586, 589 (1984) (reiterating that "*Edwards* ... established a bright-line rule to safeguard pre-existing rights," and "once a suspect has invoked the right to counsel, any subsequent conversation must be initiated by him").

■ **B. Sixth Amendment.** The Sixth Amendment to the federal constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. This constitutional provision is made binding on the states through the Due Process Clause of the Fourteenth Amendment to the federal constitution. *Gideon v. Wainwright*, 372 U.S. 335, 343, 83 S.Ct. 792, 796, 9 L.Ed.2d 799, 804–05 (1963).

■ The guarantee to counsel provided by the Sixth Amendment maintains the fair administration of our criminal justice system by assuring aid to the accused when confronted by the government adversary. *Moran v. Burbine*, 475 U.S. 412, 430, 106 S.Ct. 1135, 1146, 89 L.Ed.2d 410, 427 (1986). For this reason, the Sixth Amendment right to counsel also extends to pretrial proceedings because at those proceedings "'the accused [may be] confronted, just as at trial, by the procedural system, or by his expert adversary, or by both.'" *United States v. Gouveia*, 467 U.S. 180, 189, 104 S.Ct. 2292, 2298, 81 L.Ed.2d 146, 155 (1984) (citation omitted).

■ Our Sixth Amendment analysis involves two steps: (1) whether the right to counsel had attached when the accused made the incriminating statements, and (2) if so, whether the accused waived his or her right before making the statements. *State v. Nelsen*, 390 N.W.2d 589, 591 (Iowa 1986). An accused's Sixth Amendment right to counsel attaches upon initiation of adversary criminal judicial proceedings. *Gouveia*, 467 U.S. at 187, 104 S.Ct. at 2297, 81 L.Ed.2d at 153. Such proceedings are initiated by "formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411, 417 (1972) (plurality opinion).

■ Once the Sixth Amendment right to counsel attaches, the State is precluded from attempting to "deliberately elicit" incriminating statements from the accused, absent the presence of counsel or a valid waiver. *Kuhlmann v. Wilson*, 477 U.S. 436, 456–61, 106 S.Ct. 2616, 2628–31, 91 L.Ed.2d 364, 382–85 (1986).

■ An accused's right to counsel does not depend on the accused's request or assertion of the right. *Michigan v. Jackson*, 475 U.S. 625, 633 n. 6, 106 S.Ct. 1404, 1409 n. 6, 89 L.Ed.2d 631, 640 n. 6 (1986). Rather, the State bears a heavy burden to show "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466 (1938); *Nelsen*, 390 N.W.2d at 592. To show such a waiver, the State must establish by a preponderance of the evidence that the accused (1) understood his or her Sixth Amendment right to counsel, and (2) he or she intentionally relinquished it. *Nelsen*, 390 N.W.2d at 592. This court indulges in every reasonable presumption against waiver. *Id.*

In *Jackson,* the issue before the Court was whether the bright-line rule of *Edwards* applied in Sixth Amendment cases. *Jackson,* 475 U.S. at 626, 106 S.Ct. at 1405–06, 89 L.Ed.2d at 636. Holding that it did, the court reasoned as follows:

> Just as written waivers are insufficient to justify police-initiated interrogation after the request for counsel in a Fifth Amendment analysis, so too they are insufficient to justify police-initiated interrogations after the request for counsel in a Sixth Amendment analysis.
>
> . . . .
>
> We thus hold that, if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid.

475 U.S. at 635–36, 106 S.Ct. at 1410–11, 89 L.Ed.2d at 642; *see also State v. Newsom,* 414 N.W.2d 354, 357–58 (Iowa 1987) (applying the *Edwards* analysis to a Sixth Amendment case).

 However, even though an accused's Sixth Amendment right to counsel has attached, the police may still question the accused if the accused has not invoked the right to counsel. *Patterson v. Illinois,* 487 U.S. 285, 290–91, 108 S.Ct. 2389, 2394, 101 L.Ed.2d 261, 270–71 (1988). And the accused's incriminating statements are admissible if the accused knowingly and intelligently chooses to communicate with the police without the assistance of counsel. *Id.* Additionally, *Miranda* warnings may be sufficient to make the accused aware of his or her Sixth Amendment right to counsel and therefore render the accused's waiver knowing and intelligent. *Id.* at 293–94, 108 S.Ct. at 2395–96, 101 L.Ed.2d at 272–73. But, once the accused invokes his or her right to have counsel present, further interrogation must stop unless the accused initiates further conversation. *Id.* at 291, 108 S.Ct. at 2394, 101 L.Ed.2d at 271.

**C. Analysis.** Here, during the initial interview at the prison, Peterson invoked his right to remain silent absent the presence of an attorney. The first issue is whether Peterson was in custody for purposes of the Fifth Amendment and whether the right to counsel had attached for purposes of the Sixth Amendment. If those questions are answered in the affirmative, the issue then boils down to whether the Waterloo detectives initiated interrogation after Peterson invoked his right to remain silent absent the presence of an attorney that ultimately led to Peterson's incriminating statements. Because the *Edwards* bright-line rule applies in both Fifth Amendment and Sixth Amendment cases, the analysis on this issue is the same under both constitutional amendments.

 **1. Custody for purposes of the Fifth Amendment.** In its de novo review, the court of appeals found that Peterson was "in custody" for purposes of *Miranda* when the two detectives questioned him at the prison. We agree.

As the court of appeals noted, the fact that Peterson was an inmate at the prison did not per se mean he was in custody. *See State v. Deases,* 518 N.W.2d 784, 789 (Iowa 1994). According to *Deases,* "there must be some added restriction on the inmate's freedom of movement stemming from the interrogation itself." *Id.* Whether such an added restriction is present depends on the following factors: "the language used to summon the individual, the purpose, place and manner of interrogation, the extent to which the defendant is confronted with evidence of his guilt, and whether the defendant is free to leave the place of questioning." *Id.*

Applying these factors, the court of appeals focused on the following facts. The detectives were at the prison to serve a warrant for Peterson's arrest. A correctional officer escorted Peterson to the interrogation room, which was segregated from the general prison population. The officer shut the door and stood guard outside. Detective Moller began telling Peterson about the murder investigation to solicit information from Peterson. When Peterson stood up at one point, Moller told him to sit down. Moller testified that Peterson could not have voluntarily left the room.

Like the court of appeals, we find these facts sufficient to establish that Peterson was in custody for purposes of the Fifth Amendment. Consequently, the detectives were required to give Peterson the *Miranda* warnings before any interrogation.

**2. Whether Peterson's Sixth Amendment right to counsel had attached.** Before the detectives arrived at the prison, the State had charged Peterson with first-degree murder in connection with Smith's death. A warrant for Peterson's arrest had also been issued. Not surprisingly, then, the State concedes that Peterson's Sixth Amendment right to counsel had attached at the time of his initial interview with the two detectives.

**3. The initial interview.** When the two detectives arrived at the prison, they did not immediately serve the warrant or inform Peterson of the charge against him. Nor did they give him the *Miranda* warnings. Instead, Moller proceeded to share evidence he had gathered against Peterson with the purpose of obtaining an inculpatory statement. This is all borne out by the following testimony from Detective Holms and Detective Moller:

[HOLMS TESTIMONY] A. Then Moller asked [Peterson] if he had any idea or did he know why we were there to talk to him, and Mr. Peterson said about the car, or Howard Smith's car. And Moller said no, we were there to talk to him about the death of Howard Smith.

Q. All right. Then what happened? A. [Peterson] stood up and said he didn't do it.

Q. Then what happened? A. Moller asked him again if he would sit down and, you know, talk to him again for just a minute.

He sat back down. Moller told him since the last time that they had talked to each other he had talked to quite a few people—this is Moller saying this—and including Rubin Howard. And that's when Mr. Peterson again denied that he did it and he said he didn't want to say anything more without talking to an attorney.

. . . .

Q. Okay. What happened then? A. Moller said—he continued to talk to him, started telling him that he had learned some things and he knew that Howard, Peterson, and Billington had gone there to get some money and something had gone wrong and Howard Smith had been killed.

[MOLLER TESTIMONY] Q. All right. So did at some point [Peterson] stand up? A. He stood up and denied being involved and again the comment about the attorney. And I acknowledged that and I says—I acknowledged it and that would have been something like well that's fine, okay. There's some things I would like to—coming from—I've been to a few interview schools here lately and the words you use are share, there's some things I want to share with you here. I want to tell you about the investigation that's taken place, and I would

like to be able to tell you this. And I continued on—and I said, you know, I said sit back down again.

Moller testified he then continued to tell Peterson about what they had learned during the investigation, for example, confessions from people who were at the murder scene. And then Moller continued with this telling testimony:

> And this just doesn't hold true to this interview, this is the way I do interviews. And I would have continued on and probably said something to the effect of, Steve, ... I don't feel that you probably woke up that morning with the intent to go up there and have this happen. You went there with the intent to take some money.... But something went wrong ... and you reacted in a way that again you probably didn't intend on things to happen, but all we've got is what other people are saying. And the reason for us wanting to talk, Steve, is 'cause I want to get in your head, I want to know what was going on at that second, at that minute before that and what led up to this that caused you to do this.

This testimony clearly shows that Detective Moller initiated interrogation of Peterson after Peterson had invoked his right to remain silent absent the presence of an attorney. Not only was there express questioning, but also statements by Moller that Moller should have known were reasonably likely to elicit an incriminating response. Unquestionably, Moller by his statements was attempting to deliberately elicit incriminating responses from Peterson.

Because this was a custodial interrogation, the detectives were required to give Peterson the *Miranda* warnings. In addition, they were required to end the interrogation after Peterson asserted his right to remain silent absent the presence of an attorney. We agree with the court of appeals that Detective Moller ignored both requirements and therefore violated Peterson's Fifth, Sixth, and Fourteenth Amendment rights. At this point, none of the statements Peterson made—whether to the detectives or to Correctional Officer Holder—were admissible.

■ **4. The trip back to Waterloo.**
The next question is whether the statements Peterson made on the trip to Waterloo were likewise inadmissible. This again turns on whether the detectives initiated interrogation of Peterson. Crucial to this question is the fact that Correctional Officer ˙Holder told Moller and Holms about his conversation with Peterson on the way back to Peterson's cell. As mentioned, in response to Holder's question about what Peterson thought about being charged with murder, Peterson responded that he did not remember anything because he had been using methamphetamine for a month.

It is with this background and information in mind that the question of drugs on the trip back to Waterloo must be examined. Moller and Holms knew what Peterson had told Holder about using methamphetamine and, as the following testimony by Holms shows, used that information to probe further and elicit incriminating responses from Peterson:

> Q. Now you were driving and Investigator Moller was in the back seat with Mr. Peterson? A. That's correct.
>
> . . . .
>
> Q. What happened then? A. Well, we started driving back towards Waterloo, there was some small talk going on, we were talking about prison life, we were asking him about it.
>
> . . . .
>
> Q. Did the subject of drugs in prison come up? A. Yes, it did.

Q. How did that come up? A. We got to talking about it and I *asked* him if drugs were available in prison, can you get them there, and he said they are available. He said—I *asked* him if he used them—or Moller *asked* him if he used them, and he said no, he didn't use them.

Q. Then what happened? A. I think he said he was working out hard now instead of using anything like that.

Q. Okay. Did he say anything else? A. There was a short pause and then that's what was—what was said to Jack Holder about that he'd been bangin' a lot of meth back then and he couldn't remember anything.

Q. What happened then? A. Moller said he'd like to talk to him more, but Moller said he needed to read him his rights per *Miranda* first, which he did.

Q. Okay. And did Mr. Peterson actually waive his *Mirandas* in writing? A. He signed the *Miranda* waiver form.

Q. All right. Then what happened? A. Then there was conversation between Moller and Mr. Peterson on the way about—about the case.

(Emphasis added.)

The break in time between the questioning at the prison and the questioning in the car was very short, indicating to us that the latter was just a continuation of the former. From the above exchange in the car, it is clear that the questioning by the detectives was express. In addition, by Moller's own admission, he was not only bent on getting incriminating statements from Peterson, he was also certainly aware that his questioning on the trip to Waterloo would likely elicit those statements:

Q. I understand. But the question is do you feel that he eventually talked to you because of the seeds you planted with him pursuant to kind of the style of interrogation that you're talking about? A. Yes.

Q. And did you feel that if you hadn't planted those seeds, the guy probably wouldn't have ever talked to you if you had just shut up and not said a word to him and drove back in silence and not engaged him in conversation and never planted in his mind details of the murder investigation. A. Probably he would not have, yes.

Rarely would there be this type of testimony that unequivocally establishes that the police intended to use a style of interrogation designed to elicit an incriminating response.

We therefore conclude the detectives initiated further interrogation of Peterson in the car after he had earlier asserted his right to remain silent absent the presence of an attorney. Therefore, all statements Peterson made on the way back to Waterloo, his typewritten, signed statement, and videotaped statement given at the Waterloo police station were obtained in violation of Peterson's Fifth, Sixth and Fourteenth Amendment rights. And under *Edwards*, the waiver he signed in the car was invalid. These statements·were therefore likewise inadmissible. We agree with the court of appeals that the district court erred in admitting them at trial.

## IV. Harmless Error.

Most federal constitutional errors in the course of a criminal trial do not require reversal if the error is harmless. *Arizona v. Fulminante*, 499 U.S. 279, 306, 111 S.Ct. 1246, 1263, 113 L.Ed.2d 302, 329 (1991) (citing *Chapman v. California*, 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705, 709 (1967)). The erroneous admission of evidence in violation of a defendant's Fifth, Sixth, and Fourteenth Amendment rights is such a constitutional error subject to harmless error analysis. *Id.* at 310, 111

S.Ct. at 1265, 113 L.Ed.2d at 331–32 (admission into evidence of defendant's confession, obtained in violation of Fifth and Fourteenth Amendments, subject to harmless error analysis); *Milton v. Wainwright,* 407 U.S. 371, 372–73, 92 S.Ct. 2174, 2175, 33 L.Ed.2d 1, 3–4 (1972) (holding use of confession allegedly obtained in violation of defendant's Sixth Amendment right harmless error); *see also State v. Hensley,* 534 N.W.2d 379, 382–83 (Iowa 1995); *Deases,* 518 N.W.2d at 791.

 "Harmless-error review looks . . . to the basis on which 'the jury *actually rested* its verdict.'" *Sullivan v. Louisiana,* 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182, 189 (1993) (quoting *Yates v. Evatt,* 500 U.S. 391, 404, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432, 449 (1991)) (emphasis added). The inquiry

is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error.

*Id.* "[A]ny time an appellate court conducts harmless-error review it necessarily engages in some speculation as to the jury's decision making process; for in the end no judge can know for certain what factors led to the jury's verdict." *Id.* at 284, 113 S.Ct. at 2084, 124 L.Ed.2d at 192. (Rehnquist, C.J., concurring).

 To establish harmless error, the State must "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828, 17 L.Ed.2d at 710. We now must follow two steps in analyzing whether the State has met its burden. *Yates,* 500 U.S. at 404, 111 S.Ct. at 1893, 114 L.Ed.2d at 449; *accord Hensley,* 534 N.W.2d at 383. The first step requires us to ask what evidence the jury actually considered in reaching its

verdict. *Yates,* 500 U.S. at 404, 111 S.Ct. at 1893, 114 L.Ed.2d at 449. In doing this, we do not conduct a subjective enquiry into the jurors' minds. *Id.*

 The second step requires us to weigh the probative force of that evidence against the probative force of the erroneously admitted evidence standing alone. *Id.* Again, we are not allowed to enquire subjectively into the jurors' minds. *Id.* Rather, we must ask whether the force of the evidence is so overwhelming as to leave it beyond a reasonable doubt that the verdict resting on that evidence would have been the same without the erroneously admitted evidence. *Id.* at 405, 111 S.Ct. at 1893, 114 L.Ed.2d at 449. Only when the effect of the erroneously admitted evidence is comparatively minimal to this degree can we say that there is no reasonable possibility that such evidence might have contributed to the conviction. *Hensley,* 534 N.W.2d at 383 (citing *Yates,* 500 U.S. at 404–05, 111 S.Ct. at 1893–94, 114 L.Ed.2d at 449 and *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828, 17 L.Ed.2d at 710).

**A. Evidence jury actually considered.** In this case, the State was required to prove that Peterson killed Smith "willfully, deliberately, and with premeditation," or "while participating in a forcible felony." *See* Iowa Code § 707.2(1), (2) (1997). Besides Peterson's erroneously admitted statements, the State presented a number of witnesses. Two key witnesses were Ruben Howard (hereinafter Ruben) and Jesse Billington. Both were accomplices and both testified under grants of immunity from prosecution for first-degree murder.

Ruben gave the following testimony. On November 11, 1997, Ruben, Billington, and Peterson drove to Howard Smith's home so Billington could borrow money from Smith. This was the only thing the

three discussed doing at Smith's home in the car on the way there. When the trio arrived at Smith's home, Billington and Peterson went into the living room, and he—Ruben—stayed in the kitchen. When asked why he stayed behind, Ruben testified that he "had a guilty feeling. A feeling that something is going to happen." Ruben heard Peterson and Smith arguing and saw Peterson try to hit Smith. As Smith tried to grab Peterson's hand, Peterson pulled out a knife and "stuck Howard [Smith] in his chest" twice, after which Smith fell to the floor. Ruben had seen the knife in Peterson's possession before. Billington was "watching and snickering" when Peterson stabbed Smith.

After the stabbing, Ruben ran outside. Peterson came out and stuck the knife in the ground to clean the blood off of it. Ruben went back inside the house and helped Peterson and Billington move Smith's body from the living room floor to the bed. Billington removed Smith's pants and stole his money. The three men proceeded to steal various items from Smith's home and load them into Billington's car, including tools, antiques, some guns, a wooden chest, a TV, and a VCR. They took the stolen goods to a friend of Billington's named Bob (Robert Neith, Jr.) on the night of the murder. (Neith testified that two men came to his house "right around Thanksgiving" and tried to sell him tools. He recognized Billington as one of the men but could not identify Peterson.)

As Ruben's testimony continued, and particularly on cross-examination, many inconsistencies became apparent. For example, Ruben gave contradictory testimony on the extent to which he was able to see the room in which the stabbing happened and whether the knife found at the scene was the knife Peterson had that evening. Ruben eventually admitted his testimony at trial differed from that given

in depositions because he wanted to make his story "fit with the pictures." When asked on redirect if there was any question in his mind that Peterson stabbed Smith that night, Ruben responded, "I think he did."

As the district court described it—outside of the jury's presence—Ruben's testimony, "by any fair interpretation can only be said to be extremely contradictory." Ruben admitted to using meth and to stealing to support his habit. He also testified that he and Billington would steal things three or four times a month to get money for drugs. A twenty-seven-year-old high school dropout, Ruben had been living on Social Security disability income for ten years.

Billington, also a high school dropout, testified as to his version of what happened on the night of the killing. At Smith's home, Billington heard Smith say to Peterson, "you're the mother f'er that took my wallet." Billington walked into the living room and saw Peterson stab Smith one time in the chest. Smith fell on his back, and Billington left the room "because I was in shock." Billington described feeling "sick" and "nervous." He went to the basement and started stealing tools. Ruben came down and asked him to help move Smith's body. When Billington came upstairs, he helped Peterson and Ruben move the body to the bed. He did not see any blood. Ruben placed a magnifying glass in Smith's hand. Then, Billington stole Smith's TV and Peterson took Smith's VCR. The three left Smith's home and went to Billington's uncle's home where they sold him everything they had stolen from Smith for $50. They bought marijuana with the money and shared it. (Police eventually discovered some of the missing tools at Billington's uncle's home.)

Dr. Thomas Bennett, the medical examiner who performed an autopsy on Smith's

body, testified that Smith died of three stab wounds, one to his heart and two to his back. He testified it was possible Smith was stabbed standing up and his body was later moved to the bed where it was found. But in his opinion, it was more likely that Smith was stabbed in his bed. Dr. Lindsey Thomas, a pathologist testifying for Peterson, also believed Smith was stabbed in his bed.

Dr. Bennett pointed out several inconsistencies between Ruben's testimony and the physical evidence in the case. Chief among the inconsistencies were (1) the number of stab wounds (there were three, Ruben testified there were only two), and (2) the amount of blood present (Ruben testified blood was "dripping off the knife;" Dr. Bennett testified it would have been "unusual to have dripping."). Additionally, Dr. Bennett's testimony called into question Billington's testimony that there was only one stab wound to the chest.

The State called a number of Peterson's friends to testify about statements he made to them following Smith's death. None of these witnesses testified about any statements Peterson made that directly tied him to the stabbing. Jeremy Weekley testified that a couple weeks after Smith's death, he heard Peterson say "something about hitting . . . an old man." Peterson said "that he stuck him, but as in—Steven he always used 'sticking him' as 'punching.'" Weekley explained, "around my neighborhood we use that [the term "sticking" or "stuck"] as in fighting."

Denise Cervantes testified that one night while riding around with Peterson and Billington, Peterson pointed out where Smith's body had been found. When asked how he knew that was where the body was found and if he—Peterson—was the one who killed him, "[Peterson] and Jesse [Billington] just kind of laughed and said, no, that they didn't but they wished

that they had." Cervantes describe Peterson as a "braggart" and a "loudmouth."

Ashley Cobb testified she asked Peterson if he had anything to do with Smith's murder, or knew anything about it. Peterson told her "that it was none of my business and he was not going to tell me anything. I shouldn't have anything to do with it." Peterson got angry and threatened to throw a microwave through the windshield of Cobb's truck. Cobb also testified that Billington's reputation for truth and honesty was "not very well."

Loria Howard testified that Peterson attended a New Year's Eve party at her home in 1997. She also testified that when someone at the party asked Peterson if he killed Smith, Peterson "just laughed about it."

Ricky Howard testified that he heard Peterson say he killed Smith, but that Peterson was joking when he said it. He admitted on cross-examination that he had not mentioned Peterson's comments to the police until the fourth time he talked to them, at a time when he thought he was under suspicion for the murder. Ashley Cobb testified that Ricky Howard's reputation for truth and honesty was "not very good."

The initial investigation of the crime centered on the fact that Smith was killed in bed. Investigators found no physical evidence linking Peterson to the crime. There were no fingerprints on a knife the investigators found on a pillow on Smith's bed. Blood on the knife was consistent with Smith's DNA. Investigators found no identifiable latent fingerprints at the scene. No match was found for a shoe impression on the kitchen floor. Investigators seized a magnifying glass found in Smith's hands, but did not process it for latent prints. No trace evidence of hair or fiber was found at the scene.

■ **B. Probative force of evidence jury actually considered weighed against probative force of defendant's erroneously admitted statements.** The key question for us to consider is whether we can conclude the erroneously admitted statements are so unimportant in relation to everything else the jury considered that there is *no reasonable possibility* they contributed to Peterson's conviction. *See Hensley*, 534 N.W.2d at 384. In this case, we are convinced we cannot reach that conclusion.

The primary problem with the harmless-error analysis in this case is that the key evidence against Peterson came in the form of accomplice testimony, which must be corroborated. As mentioned, Ruben and Billington were testifying as accomplices to the murder and pursuant to a grant of immunity from prosecution by the State.

Iowa Rule of Criminal Procedure 2.21(3) provides:

*Corroboration of accomplice or person solicited.* A conviction cannot be had upon the testimony of an accomplice ... unless corroborated by other evidence which shall tend to connect the defendant with the commission of the offense; and *the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.*

(Emphasis added.) In *State v. Ware*, we said this about corroborative evidence:

The requirement of corroborative evidence is met "if it can fairly be said the accomplice is corroborated in some material fact tending to connect the defendant with the commission of the crime." Corroboration is required not only to provide a firm connection between the accused and the crime but also to enhance the credibility of an accomplice whose involvement in the crime and self-interest in blaming the defendant severely erode his believability.

338 N.W.2d 707, 710 (Iowa 1983) (citations omitted).

The corroboration of Billington's and Ruben's testimony is tenuous at best. *See State v. Fletcher*, 246 Iowa 452, 68 N.W.2d 99 (1955) (testimony of alleged accomplice linking defendant to crime not sufficiently corroborated where only independent evidence linking defendant to burglary was satchel, hammer and sledge hammer found in his automobile and in yard). Ruben's version of events seemed to change each time he told it. Billington's testimony was more consistent but his reputation for honesty and truthfulness was called into question more than once during the trial. Additionally, both admitted they were thieves and drug users and both were granted immunity from prosecution, so they had much to gain by their testimony. None of Peterson's friends who were called to testify about statements they claimed Peterson made following Smith's death directly tied him to the crime. Ricky Howard's testimony came the closest to doing so. But his testimony was suspect given that he admitted Peterson was joking. Moreover, he did not tell the police about the statement until the fourth time he talked with them, when he realized he was under suspicion.

Given the inconsistencies between the testimony of Billington and Ruben Howard, the suspect nature of that testimony, and the lack of physical evidence connecting Peterson to the crime scene, the best corroboration came from Peterson himself, in the form of the erroneously admitted statements. His statements put him at the scene, knife in hand, and an anger level of twelve on a scale of one to ten. Based on our review of the record, we cannot conclude that the "force of the evidence ... is so overwhelming as to leave it

beyond a reasonable doubt that the verdict resting on that evidence would have been the same in the absence of the [erroneously] admitted evidence." *Hensley,* 534 N.W.2d at 383 (citation omitted). Moreover, we cannot say that the effect of the erroneously admitted statements is so comparatively weak that it can be said that there is no reasonable possibility that such statements might have contributed to the conviction. *See id.* We therefore conclude the erroneous admission of Peterson's statements was not harmless beyond a reasonable doubt.

## V. Disposition.

In sum, we conclude the district court should have suppressed Peterson's statements and erred in admitting those statements into evidence. In addition, we conclude such error was not harmless beyond a reasonable doubt. We therefore vacate the court of appeals decision, reverse the district court's judgment of conviction and sentence, and remand the case for a new trial.

DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED, AND CASE REMANDED.