# IN THE COURT OF APPEALS OF IOWA

No. 13-0084
Filed August 27, 2014

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**MONTEZ TYRONE CAPLES,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Black Hawk County, Kellyann M. Lekar, Judge.


        Defendant appeals his conviction for murder in the first degree.
**AFFIRMED.**


        Mark C. Smith, State Appellate Defender, and Theresa R. Wilson, Assistant Appellate Defender, for appellant.

        Thomas J. Miller, Attorney General, Sheryl Soich, Assistant Attorney General, Thomas J. Ferguson, County Attorney, and Brian Williams, Assistant County Attorney, for appellee


        Heard by Danilson, C.J., and Potterfield and McDonald, JJ.

**MCDONALD, J.**

Murder is the case. Defendant Montez Caples firmly pressed a .357 caliber revolver to the back of Robert Shannon's neck and shot and killed him. Caples appeals his conviction for this offense, murder in the first degree, in violation of Iowa Code section 707.2(1) (2011), contending the district court improperly allowed the State to present evidence regarding Caples' and Shannon's respective gang affiliation and the district court erred in denying his motion to suppress the confession he gave to police.

I.

The court first addresses the evidentiary issue. Prior to trial, Caples filed a motion in limine seeking to exclude evidence of the victim's gang affiliation and Caples' gang affiliation. The district court denied Caples' motion, and the State presented to the jury evidence of gang affiliation tending to show Shannon and Caples were from different, rival gangs. Caples contends the gang affiliation evidence constituted "[e]vidence of other crimes, wrongs, or acts" the district court should have excluded pursuant to Iowa Rule of Evidence 5.404(b). The State first responds the gang affiliation evidence was "inextricably intertwined" with evidence of the homicide and thus admissible.

We review the district court's ruling on the admissibility of other-acts evidence for an abuse of discretion. *See State v. Reynolds*, 765 N.W.2d 283, 288 (Iowa 2009). "The abuse of discretion standard of review . . . recognizes that whether evidence of [other] crimes should be admitted is a judgment call on the part of the trial court." *State v. Rodriguez*, 636 N.W.2d 234, 241 (Iowa 2001).

The defendant has the heavy burden of establishing the trial court abused its discretion in making that judgment call. *See id.* "An abuse of discretion occurs when the trial court exercises its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *Reynolds*, 765 N.W.2d at 288 (internal quotation marks omitted). Even where the district court abused its discretion in admitting evidence, we will not reverse the judgment of the district court unless the evidentiary ruling prejudiced the defendant. *See id.*

"Not all evidence of other crimes, wrongs, or acts falls within the scope of Rule 5.404(b)." *State v. Nelson*, 791 N.W.2d 414, 419 (Iowa 2010). One such category is evidence of other conduct deemed "inextricably intertwined" in a causal, temporal, relational, or spatial sense with the charged offense. *See id.* at 419-20. In essence, inextricably-intertwined conduct is so closely related to the crime charged as to be part and parcel of the same. By its terms, rule 5.404(b) does not govern the admissibility of such evidence because the rule is applicable only to "evidence of *other* crimes, wrongs, or acts" and not evidence of conduct related to the crime charged. (Emphasis added.) Furthermore, because rule 5.404(b) is inapplicable to inextricably-intertwined evidence, "the court admits the technically uncharged evidence without limitation and irrespective of its unfair prejudice or its bearing on the defendant's bad character." *Nelson*, 791 N.W.2d at 420.

The State argues the gang affiliation was inextricably intertwined with the crime because the evidence was necessary to complete the narrative for the jury. The gang affiliation evidence explained why Caples was motivated to shoot a

man he had met only hours before. Without such evidence, the State argues, the jury would have been confused about the events leading up to the shooting. We are not convinced the evidence here is "inextricably intertwined" with the charged crime within the meaning of our cases.

The supreme court directly addressed the narrative theory in *Nelson*. The court rejected the State's argument that evidence the defendant was a drug trafficker was necessary to complete the narrative explaining a homicide. *Nelson*, 791 N.W.2d at 424. In rejecting the State's argument, the court adopted a narrow approach to the inextricably-intertwined doctrine:

> [W]e will only allow such evidence to complete the story of what happened when the other crimes, wrongs, or acts evidence is so closely related in time and place and so intimately connected to the crime charged that it forms a continuous transaction. Thus, the charged and uncharged crimes, wrongs, or acts must form a continuous transaction. Moreover, we will only allow the admission of other crimes, wrongs, or acts evidence to complete the story of the charged crime when a court cannot sever this evidence from the narrative of the charged crime without leaving the narrative unintelligible, incomprehensible, confusing, or misleading. In this way, we can be sure rule 5.404(b) remains the standard for the admission of evidence of other crimes, wrongs, or acts and the inextricably intertwined doctrine is construed as a narrow and limited exception to rule 5.404(b).

*Id.* at 423-24. As in *Nelson*, while the State's evidence of gang affiliation in this case holds explanatory power, the exclusion of such evidence does not leave the story unintelligible, incomprehensible, confusing, or misleading. Actually, the sanitized version of events is quite simple: one of the defendant's associates got into a verbal confrontation with the victim on the morning of the shooting, and the defendant retaliated later in the day. While that narrative does not have the same explanatory power it would if peppered with evidence the victim made

reference to his gang during the verbal confrontation and the defendant is a member of a rival gang, the sanitized narrative is not unintelligible, incomprehensible, confusing, or misleading.

The foregoing conclusion does not end our inquiry. We must analyze the admissibility of the evidence under rule 5.404(b), which provides "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith." The rule is intended to exclude propensity evidence: "evidence that serves no purpose except to show the defendant is a bad person, from which the jury is likely to infer he or she committed the crime in question." *State v. Putman*, 848 N.W.2d 1, 8 (Iowa 2014). The evidence is admissible for non-propensity purposes, however, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Iowa R. Evid. 5.404(b). In determining whether such evidence is admissible, we engage in a three-step analysis. *See Putman*, 848 N.W.2d at 9. "A court must first determine whether the evidence is relevant to a legitimate, disputed factual issue." *Id.* Second, there also must be clear proof the individual against whom the evidence is offered committed the bad act or crime." *Id.* Finally, "[i]f the evidence is relevant to a legitimate and disputed factual issue, and the clear-proof requirement is satisfied, the court must determine whether the evidence's "probative value is substantially outweighed by the danger of unfair prejudice to the defendant." *Id.*

There is little doubt the evidence is relevant. Although motive is not an element of murder, motive evidence is probative of the question of whether the

defendant acted with malice aforethought. *See Nelson*, 791 N.W.2d at 426 (concluding motive was relevant); *State v. Shortridge*, 589 N.W.2d 76, 83 (Iowa Ct. App. 1998) (stating evidence of other conduct is relevant to establishing a relationship between the parties and a motive for homicide); *Heath v. State*, No. 06-0492, 2007 WL 1687773, at *2 (Iowa Ct. App. June 13, 2007) (stating "the gang membership of the participants was a key ingredient in the circumstances that lead to the shooting" and thus admissible); *State v. Gunther*, No. 06-0018, 2007 WL 911895, at *3 (Iowa Ct. App. Mar. 28, 2007) (allowing evidence of other acts to establish motive).

There is also clear proof of gang affiliation. Clear proof does not require proof beyond a reasonable doubt. *See State v. Newell*, 710 N.W.2d 6, 23 (Iowa 2006). Instead, "there simply needs to be sufficient proof to prevent the jury from engaging in speculation or drawing inferences based on mere suspicion." *Id.* Testimony of a credible witness can satisfy this requirement. During the verbal altercation that triggered the chain of events, Shannon identified himself as a blood. At the scene of the crime, the police found a red handkerchief—associated with the blood gang—draped over the steering wheel. Jamie Billington, a friend of Caples, testified Caples belonged to the Gangster Disciples, a rival gang. Caples' tattoos and clothing corroborated this fact. In addition, contemporaneous text messages corroborated Caples' gang affiliation. For example, shortly prior to the murder, Billington texted Caples and asked if he wanted his "flag," i.e., his colored bandana.

We finally address the question of whether the probative value of the evidence substantially outweighs the danger of unfair prejudice. Caples argues evidence of gang affiliation was inherently prejudicial and requires reversal. Caples relies on *State v. Nance*, 533 N.W.2d 557, 562 (Iowa 1995), a homicide case, in which the court stated "evidence of gang membership and activity is inherently prejudicial [because] [i]t appeals to the jury's instinct to punish gang members." Caples reads too much into the phrase "inherently prejudicial." All "[r]elevant evidence is inherently prejudicial in the sense of being detrimental to the opposing party's case." *State v. Delaney*, 526 N.W.2d 170, 175 (Iowa Ct. App. 1994). The relevant inquiry is not whether the evidence is prejudicial or inherently prejudicial but whether the evidence is unfairly prejudicial, that is the "evidence has an undue tendency to suggest a decision on an improper basis." *Id.* "Unfair prejudice exists when minimally relevant evidence could lead a jury to improperly use it to reach a decision based on inflammatory and emotional considerations that are unfavorable to a victim because of his or her conduct or lifestyle." *State v. Shearon*, 449 N.W.2d 86, 88 (Iowa Ct. App. 1989).

In weighing the probative value of the evidence versus the danger of unfair prejudice, the court considers the following factors: "(1) the actual need for the evidence in view of the issues and other available evidence, (2) the strength of the evidence showing the other acts or crimes were committed by the accused, (3) the strength or weakness of the other crimes evidence supporting the issue, and (4) the degree to which the jury will probably be roused by the evidence and use it improperly." *Delaney*, 526 N.W.2d at 175-76. On balance,

we cannot say that the trial court did not fairly weigh the probative value of the evidence against the probable dangers of admitting it. The State's presentation of gang evidence was limited. The State did not present expert testimony on gangs, gang violence, gang-related criminal activity, or otherwise emphasize the evidence. Instead, the evidence was offered quickly in conjunction with the narrative of events without further elaboration. The gang affiliation evidence was unlikely to arouse the jury's passions given the nature of the crime charged. *See State v. Larson*, 512 N.W.2d 803, 808 (Iowa Ct. App. 1993) (noting the challenged evidence "did not involve conduct any more sensational or disturbing" than the crime charged). Accordingly, we hold the district court's resolution of this delicate balancing process was reasonable and did not constitute an abuse of discretion. *See Astello v. State*, No. 02-2085, 2004 WL 239852, at *2 (Iowa Ct. App. Feb. 11, 2004) (explaining evidence of gang affiliation was relevant and not unfairly prejudicial when used to show how the defendant became involved with the events leading to the homicide and where victim was found gagged with red bandana).

Even assuming the evidence should have been excluded, "[r]eversal is not required for the erroneous admission of evidence unless prejudice results." *Rodriquez*, 636 N.W.2d at 244. "To establish prejudice, [Caples] must show a reasonable probability that but for the error the outcome of the trial would have been different." *See id.* "Where the other evidence overwhelmingly establishes the defendant's guilt, we have applied the harmless error doctrine." *Id.*

We conclude there is overwhelming evidence of guilt and any evidentiary error was harmless.  At the time of the homicide, the victim, Shannon was in the front seat of his vehicle, and Caples was in the backseat with his friend Jamie Billington.  At trial, Billington testified Caples pulled out a gun and shot Shannon from the backseat. William Douglas, the uncle of Caples' friend DiWayne Brown, met Caples after the shooting and helped Caples dispose of the gun.  Douglas later cooperated with law enforcement and led them to the gun and to the casings fired from the gun.  DNA on the barrel of the recovered gun was consistent with Shannon's DNA.  Caples sent contemporaneous text messages regarding the shooting.  Subsequently, and addressed in more detail below, Caples confessed to killing Shannon upon being interviewed by the police. Finally, Caples sent a letter to a friend after the fact stating because he "was man enough to do the crime," he "would be man enough to do the time."  Given the foregoing, any reference to gang affiliation was not prejudicial.

## II.

The court next addresses Caples' claim the district court erred in denying his motion to suppress his confession made to the police.  Caples contends the confession was obtained in violation of his *Miranda* rights.  We review constitutional issues de novo.  *See State v. Pearson*, 804 N.W.2d 260, 265 (Iowa 2011) ("We review de novo a district court's refusal to suppress statements allegedly made in violation of constitutional safeguards.").  "We make an independent evaluation of the totality of the circumstances as shown by the entire record."  *See State v. Palmer*, 791 N.W.2d 840, 844 (Iowa 2010) (citation

omitted). "We consider both the evidence introduced at the suppression hearing as well as the evidence introduced at trial." *See id.*

The Fifth Amendment to the Federal Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Due Process Clause of the Fourteenth Amendment to the Federal Constitution makes this right against self-incrimination binding on the states. *Malloy v. Hogan*, 378 U.S. 1, 6 (1964). The Supreme Court has concluded prophylactic warnings designed to dispel the coercion inherent in custodial interrogation must be provided to any person questioned by the police after being "taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The person must be warned that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* at 444. In *Arizona v. Edwards*, the Supreme Court held once the accused exercises the right to counsel, "interrogation must cease until an attorney is present" or the accused initiates "further communications, exchanges, or contestations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). However, not every action by an accused amounts to initiation of further communication; a person must manifest "a willingness and a desire for a generalized discussion about the investigation." *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983).

The record reflects Caples came to the police station and was interviewed or interrogated on several different occasions over two days while the police

were investigating Shannon's murder. He contends the police repeatedly ignored his invocation of his right to counsel. The State contends Caples voluntarily continued to speak to investigators following renewed *Miranda* warnings. We focus on the last interview because only the last interview elicited a confession. During the last encounter with police, Caples requested counsel, as he arguably had done in prior encounters with the police. The police ceased interrogation but placed Caples in a holding cell and told him he would be charged with murder. Several hours later, Caples banged on his cell door and requested to speak to somebody. The investigating officer read Caples the *Miranda* warnings. Caples waived his rights and confessed to the murder. He contends the police failed to honor his request to speak with counsel by continually reinitiating conversation with him and engaging in activities reasonably geared to prompt a response by Caples. Although we conclude Caples' confession was not obtained in violation of his rights, we deny Caples' claim on the ground any error was harmless.

"Most federal constitutional errors in the course of a criminal trial do not require reversal if the error is harmless." *State v. Peterson*, 663 N.W.2d 417, 430 (Iowa 2003). This includes the erroneous admission of a confession in violation of the defendant's rights. *See id.* Constitutional harmless error analysis focuses on the grounds upon which "the jury *actually rested* its verdict" and not on what some hypothetical jury would have done. *See Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993). The issue "is not whether, in a trial that occurred without the

error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." *Id.*

It is the State's burden to prove harmless error. The State must "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24 (1967). In conducting the harmless error analysis, we consider the "evidence the jury actually considered in reaching its verdict." *Peterson*, 663 N.W.2d at 431. We then "weigh the probative force of that evidence against the probative force of the erroneously admitted evidence standing alone." *Id.* Within this framework, error is harmless when "the force of the evidence is so overwhelming as to leave it beyond a reasonable doubt that the verdict resting on that evidence would have been the same without the erroneously admitted evidence." *Id.*

In this case, the State was required to prove Caples acted with malice aforethought and acted "willfully, deliberately, premeditatedly and with the specific intent to kill Robert Shannon." There is overwhelming direct and circumstantial evidence supporting the verdict. Billington was with both men in the car as Caples executed his ruse, which was to have Shannon drive them around Waterloo for the purported purpose of finding an isolated place to smoke marijuana but for the real purpose of isolating and killing Shannon. Billington was in the backseat with Caples when he pulled the gun and shot Shannon in the back of the neck. Billington testified Shannon had not made any threats toward them prior to Caples killing Shannon. Billington also testified that she and Caples fled to Brown's house after the shooting. Because they could not find bleach,

Brown urinated on Caples' hands in an attempt to cleanse them of any evidence. Douglas then assisted Caples in disposing of the firearm and shell casings. Later, Douglas cooperated with law enforcement and helped law enforcement retrieve the items. DNA evidence linked the gun to Shannon. Text messages and phone calls corroborate the witness's testimony regarding the events leading up to the shooting and Caples' involvement in the shooting. Finally, independent of any confession, Caples wrote to a friend that if he was man enough to do the crime, he was man enough to do the time.

The confessions, when viewed within the context of the case as it was actually tried to this jury, did not reasonably contribute to the verdict. This case was tried as a "whydunit" not a "whodunit." Whodunit was not in dispute. Caples' defense strategy was to admit to the jury he killed Shannon but only because his friend DiWayne Brown coerced him to do so. The contested issue was Caples' culpability. For instance, in the opening statement, Caples' lawyer said, "DiWayne [Brown] gets his .357 Magnum, his gun, and he gives it to Montez Caples and says, Montez, you have to kill that guy or I'm going to kill you." Later defense counsel argued to the jury, "DiWayne Brown wasn't in the car, but he could have been. DiWayne Brown didn't pull the trigger, but it was his actions that pulled the trigger." In closing argument, Caples' attorney argued to the jury, "Robert Shannon's fate was sealed because of DiWayne Brown. Because DiWayne Brown wasn't going to do it himself and he knew that Montez would do it because he knew he had a few things. He had fear. He had control and he had power." Later he said, "You saw [Caples] apologize, real emotion.

But through it all he always said it was DiWayne Brown. It was DiWayne Brown that made me do it. [DiWayne] is a kingpin and I'm not looking to die." Finally, counsel argued to the jury:

> This cause, ladies and gentlemen, at its heart it's about fear, it's about control, it's about power and on December 14, 2011, it was also about a gun. A gun that Montez Caples believed would be pointed at him if he didn't do exactly what DiWayne ordered him to do. . . . [Caples] didn't make arrangements, he followed orders. Throughout that day we've heard about decisions that were made. But at no point was Montez Caples the one who was making those decisions. Montez Caples' actions that day were never of his own volition. He was never, that day, acting voluntarily of his own free will. Because that day it was all about power, fear, and control, and that's DiWayne Brown.

Caples confession is consistent with his theory of the case and did not advance the State's case. In his confession, Caples told police that Brown forced him to kill Shannon. Caples told the police that Brown was the person truly responsible for the murder because Caples did not "have the balls to do nothing like that by myself."

Under these facts and circumstances, we conclude any constitutional error was harmless. *See, e.g.*, *Howard v. State*, 586 So. 2d 289, 293 (Ala. Crim. App. 1991) (holding admission of confession to robbery was harmless error where defendant's trial strategy was to admit to conduct but argue degree of culpability) *abrogated in part by McLeod v. State*, 718 So. 2d 727 (Ala. 1998); *Neelley v. State*, 494 So. 2d 669, 674-75 (Ala. Crim. App. 1985) (holding admission of confession was harmless error where defense theory was to admit to homicide but contest the defendant's mental state and legal culpability).

III.

For the foregoing reasons, the judgment of the district court is affirmed.

**AFFIRMED.**