# IN THE COURT OF APPEALS OF IOWA

No. 20-1162
Filed November 23, 2021

**STATE OF IOWA,**
     Plaintiff-Appellee,

**vs.**

**DOBOL RIAL KOAT,**
     Defendant-Appellant.
_____

Appeal from the Iowa District Court for Pottawattamie County, Greg W. Steensland (motion to suppress) and Michael Hooper (trial), Judges.

A defendant appeals his conviction for murder in the first degree. **AFFIRMED.**

Martha J. Lucey, State Appellate Defender, and Shellie L. Knipfer, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Kyle Hanson, Assistant Attorney General, for appellee.

Considered by Tabor, P.J., and Greer and Badding, JJ.

**TABOR, Presiding Judge.**

Dobol Koat challenges his conviction for first-degree murder in the stabbing death of William Dut.  Neighbors spotted Dut's body in an alley one-half block from the studio apartment where he had been staying with Koat.  On appeal, Koat raises three issues.  First, Koat contends the district court should have suppressed his statements to police.  Second, he argues the State did not offer sufficient evidence to prove his identity as the killer.  And third, Koat insists the court should have excluded testimony he was burning clothes in the alley *before* Dut's murder.  Because the district court properly overruled Koat's suppression motion in part, the State offered strong circumstantial evidence of his guilt, and the evidentiary ruling on the burned clothes was not an abuse of discretion, we affirm.

## I.     Facts and Prior Proceedings

In early October 2019, Dut finished serving a prison sentence for operating while intoxicated, third offense, and moved in with Koat in his Council Bluffs studio apartment.  But this arrangement wouldn't last.  Less than one month later, passersby discovered Dut's body, wrapped in a sheet, left in the alley near Koat's apartment.  Early Monday morning, October 28, two neighbors saw a hand protruding from the bundled sheet but thought the body was a Halloween prop and did not stop.  Later that morning, another neighbor checked to see if he could wake the person.  He found no pulse.  With a fingerprint match, investigators identified the deceased as Dut.  When they went to Koat's apartment, they found blood smeared on the door and dried on the concrete walkway.  They knocked, but no one answered.

After obtaining a search warrant, police entered, guns drawn, finding a "very calm" Koat sitting in the apartment. Detective Ron Branigan noticed: "Everything in the apartment seemed to be in order." But beneath the outward order was a bloody crime scene. The bed was made with a flat sheet matching the fitted sheet wrapped around Dut's body. When investigators flipped the mattress, they found concentrated blood stains. They also noted "smeared blood on the floor, wiped down blood." Similar streaks of blood appeared on the windowsill near the bed. Their UV light showed strands of what appeared to be blood on a mop in the apartment. Investigators also documented blood spatter on the walls and ceiling. DNA testing confirmed the blood belonged to Dut.

The prevalence of blood in the apartment bespoke the brutality of Dut's injuries. An autopsy detected a dozen stab wounds to Dut's head and neck. One deep gash to his neck extended all the way to his spine. The medical examiner believed the perpetrator used a serrated knife to inflict those stab wounds. But the medical examiner found Dut had no defensive wounds, documenting only a small abrasion on the victim's right hand. Dut also suffered a fractured cheek bone, sternum, and skull from blunt force trauma. This array of injuries led to the State's theory: "Almost certainly William Dut was attacked while he was sleeping."

The parties debated the timing of that attack. Koat focused on the medical examiner's testimony about rigor mortis. When she conducted the autopsy on Tuesday morning, October 29, she noticed "moderate" rigor mortis in all of Dut's extremities. She explained "one of the signs of death is rigor mortis, . . . that is as the chemicals that are available to the body for energy begin to dissipate with cell death, then the muscles tighten." She testified rigor mortis generally appears

within hours after death and reaches its maximum "in the neighborhood of twelve hours, plus or minus." The condition usually dissipates between thirty-six and seventy-two hours after death, according to the medical examiner. But she also testified rigor mortis is affected by many factors and can be slowed by cool temperatures.[1]

The State advanced its theory that Koat killed Dut on Friday night, October 25. To support that timing, the prosecutor presented evidence that Dut was planning to move and the property manager showed him a vacant apartment late Friday afternoon. But Dut appeared distressed when the manager's office closed before he could pay the deposit. In a phone conversation around 8:30 p.m., Dut told a friend about plans to move into a new apartment. His friend never heard from Dut again, despite calling and sending messages. An active Facebook user, Dut last accessed the social media network early Friday morning.

Meanwhile, Koat left work early Friday night, clocking out of his shift at 9:51 p.m., after less than an hour on the job. Just after 11:00 p.m., Koat used Dut's cell phone to call a ride-sharing service to report that he'd forgotten his own phone in a Lyft car. Koat was scheduled to work both Saturday and Sunday nights, but he did not show up. His downstairs neighbor was home sick that weekend but did not hear any movement in Koat's apartment, describing it as "dead quiet."

As it turns out, Koat had left town, traveling to Des Moines on Saturday and buying a new cell phone at a local Cricket store. He then went to Marshalltown, staying overnight at the Motel 6 and watching a football game at the Applebee's

---

[1] Police testified the morning of October 28 was "very cold" with temperatures in the low thirties when they arrived at the alley where Dut's body had been dragged.

bar. Records for Koat's new cell phone showed that he traveled back through Des Moines Sunday night and arrived home in Council Bluffs by the early morning hours of Monday, October 28.

After identifying Dut's body in the alley that morning and discovering evidence of the stabbing in the nearby studio apartment, police focused their investigation on Koat. They interviewed him three times: once the afternoon of October 28 at the apartment, about one hour later at the police station, and again on November 26 at the police station. Koat did not admit killing Dut in these interviews. But the State later pointed to lies that Koat told to the police as evidence of his guilty knowledge.

In early December, the State charged Koat with murder in the first degree, in violation of Iowa Code sections 707.1 and 707.2(1) (2019). He moved to suppress the statements he made to police during the three interviews. The district court suppressed the statements from the first interview, but found Koat's statements from the second interview and much of the third interview were admissible. The case proceeded to trial in February 2020. A jury found Koat guilty as charged. The court sentenced him to life in prison without the possibility of parole. He now appeals.

## II.    Scope and Standards of Review

Koat's three claims call for varying standards of review. First, we review his suppression issue de novo to the extent that he raises constitutional claims. *See State v. Hillery*, 956 N.W.2d 492, 498 (Iowa 2021). But we review a ruling on promises of leniency under the common law evidentiary test for correction of errors at law. *Id.* Second, we review his challenge to the sufficiency of the evidence for

the correction of legal error. *See State v. Schiebout*, 944 N.W.2d 666, 670 (Iowa 2020). Third, we review the court's admission of evidence over his relevancy objection for an abuse of discretion. *Graber v. City of Ankeny*, 616 N.W.2d 633, 638 (Iowa 2000).

### III. Analysis

### A. Suppression of Statements

Koat moved to suppress statements he made to police during three interviews. Koat argued his statements at the apartment were inadmissible because police did not give him *Miranda* warnings[2] before asking him questions. He sought to exclude his statements from the second and third interviews as continuations of that *Miranda* violation and as involuntary. The district court suppressed the statements Koat made when police questioned him at the apartment. But the court allowed the State to offer statements Koat made after being *Mirandized* at the police station before the second interview. As for the third interview, the court allowed the State to offer Koat's statements from the first hour of the interview, but suppressed statements made after he invoked his right to counsel. On appeal Koat alleges all of his statements should have been out. We examine each set of statements in turn.

**October 28 at the apartment.** Once police had a search warrant, three officers entered, guns drawn, into the apartment that Dut shared with Koat. Police handcuffed Koat, but told him that he was not under arrest as they performed a sweep of the apartment. Detective Branigan recorded a three-minute interview

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

with Koat, asking his name, social security number, work schedule, and when he last saw Dut.[3]  Koat said he worked the night before and arrived home around 6:30 a.m.  Koat claimed he last saw Dut on Thursday, three days earlier.  Koat explained they worked different shifts and after work Dut would "hang out with his friends" or visit a girlfriend in Omaha.  After that brief interrogation, police transported Koat to the police station.

**October 28 at the police station.**  In the late afternoon, about one hour after their first encounter, police conducted another interview with Koat—this time at the station.  Once there, Koat received his *Miranda* warnings and agreed to speak with the detective.

Koat told the detective that he went to work on Friday night and returned Saturday morning to find Dut gone.  Koat claimed to have slept all day Saturday before returning to work that night.  When he returned home Sunday morning, according to Koat, he showered, slept, and watched television.  He said that Sunday night he took a bus to Omaha to see "one of [his] girls."  Koat recalled they went to a bar in the Old Market district.  But Koat could not tell the detective the name of the girlfriend or the bar.  He estimated returning home around 3:00 a.m. Monday.  Koat said he did not hear from Dut and did not try to contact him because Koat lost his phone in a taxi.  Koat denied arguing with Dut: "Me and William, we are good."

---

[3] Detective Branigan referred to Dut as Koat's cousin.  But Koat later clarified for the detective that they were unrelated by blood, though he claimed to treat Dut "like a brother."

But the detective persisted: "I think it would be in your best interest to tell me if you guys got into a fight." Koat answered: "Nah."[4] The detective pressed the point, suggesting the large amount of blood found in the apartment did not fit with Koat's story. Branigan then said: "[I]t's going to help you if you tell the truth." Koat insisted he was telling the truth: "[W]hy would I lie . . . ?"

Through later investigation, Detective Branigan established that Koat was lying about his actions that weekend. For instance, the bus schedule from Council Bluffs to Omaha conflicted with Koat's story. What's more, Koat's work records and banking transactions also contradicted his version of events. The detective could establish that Koat spent the weekend in Des Moines and Marshalltown.

**November 26 at the police station.** Just before Thanksgiving, police gathered more evidence and decided to re-interview Koat. Detective Branigan, who had secured a warrant for Koat's arrest, reminded Koat of his *Miranda* rights before this third session. When asked again about his activities in late October, Koat shifted his story, recalling his trip to Omaha was on Saturday rather than Sunday. Koat said: "I called in [to work] that Saturday night . . . and then was hanging out with my girl." But Koat still professed not to know her name: "I just met her." Koat then told the detective that he had gone to work on Sunday, which the detective knew was not true.

When asked about his new cell phone, Koat claimed he bought it from a friend, later saying he bought the phone from a "white guy" in the neighborhood. When the detective revealed that he spoke to the salesperson in Des Moines who

---

[4] Later Koat acknowledged Dut may have been unhappy staying with him and would talk behind Koat's back.

sold Koat the phone, Koat maintained: "I bought it here man." Confronted with "not being honest," Koat dug in: "I'm going to stick to my story." When the detective asked Koat how he got to Marshalltown, Koat replied: "Who me?" When pressed, Koat relented and said his girlfriend may have driven him there when he was passed out. After the detective confronted Koat with evidence that he had stayed overnight at the Motel 6 in Marshalltown, Koat replied: "Right now when you remind me I remember." Throughout the interview, Koat maintained he did not argue or fight with Dut.

About one hour and nine minutes into the interview, Detective Branigan told Koat: "[T]his is your one chance to be cooperative and tell me what happened. This is it because if you don't tell me you're going to jail." Koat responded: "Hey hey I got my lawyer though you know so don't try to (inaudible) I try tell you man come on now. I got a right too." Soon after that exchange, the detective took a ten-minute break and returned to tell Koat:

> I want to clarify something that I said earlier okay. I misspoke alright. I think I told you earlier that if you didn't start cooperating and telling me the truth you're going to go to jail. That's I didn't mean to say that. What I meant to say was no matter what you're going to jail. Okay, you're going today. You're not going home.

Despite the detective's efforts to clarify, the district court suppressed any statements that followed Koat's reference to his right to counsel.

**Suppression Arguments on Appeal.** Koat advances two reasons for reversing the suppression ruling. First, he contends the district court should have excluded all statements from the second and third interviews because those interrogations were a continuation of the *Miranda* violation during the first interview. He relies on *Missouri v. Seibert*, 542 U.S. 600, 607 (2004), for the proposition that

*Miranda* warnings given after an unwarned confession may be ineffective. Second, he believes his statements during the second interview were involuntary as the product of promissory leniency. We take each argument in turn.

### 1. Continuation

Koat ventures that his interrogations were "all a continuation from one to the other" so suppression of his statements at the apartment should have dictated suppression of his statements gained in the second and third interviews.[5] He compares his case to *Seibert*, where the Supreme Court found the suspect's statements made after a *Miranda* warning were inadmissible because the later questioning was a "mere continuation" of earlier questioning conducted without the rights advisory. *See* 542 U.S. at 617 (holding it was "reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before").

That comparison is inapt. Koat's situation bears little resemblance to *Seibert*. For instance, *Seibert* addressed a practiced technique of law enforcement to conduct a custodial interrogation without *Miranda* warnings until garnering a confession and then, midstream, recite the warnings and cover the same ground a second time. *Id.* at 604.[6] Council Bluffs police were not following that kind of

---

[5] Before reaching the merits, the State argues Koat did not preserve error on his *Miranda/Seibert* challenge to the third interview because the district court did not rule on that claim. In reply, Koat reasons "the only way the third interrogation could be involuntary was if the second interrogation was involuntary and that involuntariness *continued* to the third interrogation." So the district court's rejection of the continuation argument for the second interview would logically be a rejection of the same argument for the third interview. We agree with that reasoning and reach the merits of Koat's claim.

[6] As the State points out, Koat relies on the analysis of *Seibert's* plurality of four justices. In providing the fifth vote, Justice Kennedy held that heightened scrutiny

systemic protocol. Rather, they believed, albeit wrongly, that Koat was not in custody at the apartment.[7] But police provided appropriate *Miranda* warnings once they transported him to the station. Likewise, they provided *Miranda* warnings again before the November interview. A second difference from *Seibert* is that Koat did not confess to the murder in any of the three interviews. The cat was not out of the bag. *See id.* at 615. Koat's statements were only incriminating because they showed he lied about his weekend activities and changed his story to match proof offered by the police.

The proper parallel is *Oregon v. Elstad,* 470 U.S. 298, 311–14 (1985). In *Elstad*, an officer spoke with an eighteen-year-old suspect in his living room. 470 U.S. at 300–01. The officer told Elstad that he believed the teenager was involved in the burglary of a neighbor's house. *Id.* Elstad replied, "Yes, I was there." *Id.* at 301. Police then transported Elstad to the station and, about one hour later, read him his *Miranda* rights. *Id.* Elstad waived those rights and gave a full statement admitting his involvement in the crime. The Court held that a suspect "who has

should apply only to those cases in which police deliberately employed a two-step procedure designed to weaken *Miranda*'s protections. *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment). Notably, most of the federal circuits, including the Eighth Circuit, have employed Justice Kennedy's separate concurrence as the controlling opinion under the narrowest-grounds doctrine. *See State v. Gomez,* No. 11-0350, 2012 WL 2122266, at *8 (Iowa Ct. App. June 13, 2012) (collecting cases).

[7] The State's first response to Koat's suppression issue is that the district court was wrong in finding he was in custody during the first interview. Assuming the State can advance that argument on appeal without having sought discretionary review to challenge the suppression of those initial statements, we reject its premise. We share the district court's view that Koat was in custody when, guns drawn, police officers entered his apartment, placed him in handcuffs, stood close, and questioned him about when he'd last seen Dut. *See State v. Miranda*, 672 N.W.2d 753, 760 (Iowa 2003) (finding suspect was in custody when questioned in his home because "usual comforts of home were taken away").

once responded to unwarned yet non-coercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Id.* at 318. *Siebert* created an exception to *Elstad* when a suspect alleges police obtained his statements through a two-part interrogation calculated to circumvent the *Miranda* protections. *See United States v. Magallon*, 984 F.3d 1263, 1283 (8th Cir. 2021). "Where there has been no such calculated effort, the admissibility of a post warning statement should continue to be governed by *Oregon v. Elstad.*" *United States v. Torres-Lona*, 491 F.3d 750, 757–58 (8th Cir. 2007).

As in *Elstad*, Council Bluffs police miscalculated the custodial nature of the living-room interview. But Koat does not allege they carried out a deliberate deprivation of his rights designed to circumvent *Miranda*. Under these circumstances, giving warnings at the police station provided adequate protection.[8] We thus reject Koat's continuation argument for suppression.

### 2. Promises of Leniency

As a second route to suppress his second set of statements, Koat alleges two phrases used by the detective fell into the category of promissory leniency. One, it was in his "best interest" to admit if he had a fight with Dut. Two, it would "help" him to tell the truth. Koat claims after those entreaties, he "made inculpatory statements" that Dut sometimes talked behind his back and may have been

---

[8] We also doubt that *Seibert* applies when, as here, the unwarned statements are not a confession, but incriminating only through later investigation proving them false. *See* 542 U.S. at 616 ("The impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given.").

unhappy with their living arrangement. On appeal, Koat insists those statements undermined his other assertions that he and Dut got along well.

The State challenges preservation of error, contending the district court did not rule on Koat's claim of promissory leniency when declining to suppress his statements from the second interview. Koat acknowledges the district court was "very succinct" on this point but contends its finding that Koat's statement were "voluntarily given" in the second interview preserved error. We disagree with Koat's contention. The district court issued a nine-page, detailed suppression ruling. The court discussed confessions induced by improper threats or promises when analyzing the third interview, but not in relation to the second interview. Because we do not have a ruling to review, we cannot reach this claim.[9] *See State v. Mitchell*, 757 N.W.2d 431, 435 (Iowa 2008) (holding defendant waived issue overlooked in ruling by not seeking to enlarge trial court's findings).

### B. Substantial Evidence

Koat next contends the State failed to present substantial evidence that he was the person who killed Dut. We consider evidence to be "substantial" if it can convince a rational jury that the defendant was guilty beyond a reasonable doubt. *State v. Chapman*, 944 N.W.2d 864, 871 (Iowa 2020). We view the evidence in the light most favorable to the State. *Id.* Evidence is not substantial if it only creates "speculation, suspicion, or conjecture." *Id.* "Identity is an element of a

---

[9] Even if Koat had preserved error on this claim, the record does not support his argument that the detective employed improper inducements or that Koat's rather benign responses were prejudicial. *See State v. Hodges*, 326 N.W.2d 345, 349 (Iowa 1982) (explaining officer can ordinarily tell suspect it is better to tell the truth).

criminal offense which the State must prove beyond a reasonable doubt." *State v. Jensen*, 216 N.W.2d 369, 374 (Iowa 1974).

Koat highlights weaknesses in the State's case. He points out the State did not offer witnesses to the stabbing or to the act of dumping the body in the alley. Koat emphasizes he had no offensive wounds and no motive. He also notes police never identified a murder weapon. Beyond those gaps, Koat contests the timing critical to the State's theory. In doing so he relies on the medical examiner's testimony that rigor mortis usually recedes after seventy-two hours. Koat asserts: "The body would have been sitting in his apartment at room temperature for over 50 hours. And it would have been in a state of rigor mortis for 80 hours when it was autopsied on Tuesday."

Playing defense on the timing issue, the State discounts those rigor mortis generalities. It cites the medical examiner's opinion that rigor mortis cannot reliably establish a time of death.[10] And the State stresses the variables at play, including the uncertainty where Dut's body was placed after the stabbing and the cold temperatures that late October.

Switching to offense, the State points to five aspects of its case that it believes add up to substantial evidence. One, blood spatter in Koat's apartment proves it was the location of the murder. Two, Koat left town when Dut disappeared and returned two days later when his body appeared in the alley one-half block from his apartment. Three, investigators found Koat's DNA on the knotted sheet wrapping Dut's body. Four, investigators also found bundled inside

---

[10] For instance, the medical examiner testified that two bodies can experience "quite different" levels of rigor mortis despite being in the same room.

the sheet a temporary identification card assigned to Koat at his prior job. And five, Koat gave the police false and shifting stories about his activities that weekend.

We agree the whole of the State's case—though circumstantial—adds up to substantial evidence proving beyond a reasonable doubt that Koat killed his roommate Dut. *See State v. Linderman*, 958 N.W.2d 211, 220–21 (Iowa Ct. App. 2021) (noting defendant was "evasive and dishonest when interviewed by law enforcement"). True, this record contains no "smoking gun" (or, for that matter, serrated knife) showing Koat was the killer. "Yet, the State presented the jury with important circumstantial evidence." *State v. Huser*, 894 N.W.2d 472, 492 (Iowa 2017). For instance, the jury could infer that Koat had the most motivation and best opportunity to clean up the crime scene where he also lived. It defies logic that an intruder would try to mop up blood smears and change the bed sheets after dragging Dut's body down the alley.

The jury could also infer Koat's connection to the murder and disposal of the body from two items of evidence found in the bundled bedsheets. First, an identification card Koat used at a previous job was inside the bundle. Second, investigators detected Koat's DNA on the seam near one of the knots tied in the fitted sheet. The DNA at that location was more damning given Koat's explanation in interviews that he slept on the sofa while Dut took the bed.

Adding to the proof against Koat were his own false denials and his ever-changing narrative of his weekend activities. Koat lied to police about when he worked and where he went after last seeing Dut. The jury could interpret Koat's dodges and dishonesty as indications of guilt. *See State v. Cox*, 500 N.W.2d 23,

25 (Iowa 1993); *see also State v. Leutfaimany*, 585 N.W.2d 200, 206 (Iowa 1998) (holding jury had a right to consider that defendant only admitted his involvement when confronted with videotape evidence).

As for the lack of offensive wounds on Koat's hands, the detective testified the knife used to stab Dut may have had a hilt, which would protect the perpetrator's hands. Plus, the concentration of the blood on the mattress and lack of defensive wounds to Dut supported the State's theory that Dut was likely sleeping when attacked and had no chance to fight back.

Finally, on the motive issue, as the State emphasizes, it did not have to prove why Koat killed Dut. *See State v. Caples*, 857 N.W.2d 641, 646 (Iowa Ct. App. 2014) (noting "motive is not an element of murder"). But it takes little imagination to suppose that the roommates had grown weary of their close living quarters. Testimony showed Dut was upset that he could not drop off his deposit for an apartment of his own on the Friday afternoon before he was killed. But even without presentation of a clear motive, a wealth of circumstantial evidence pointed to Koat as the killer.

We decline to disturb the jury's guilty verdict.

### C.      Relevancy of Burning Clothes Before Murder

Before trial, Koat moved in limine to exclude evidence that witnesses saw Koat burning clothes in the alley the morning of October 25. The motion urged: "Dut is known to have been alive until at least 8:30 p.m. on October 25, 2019, well after the burning of these clothes. The burning of the clothes has no relevancy to this case and will only serve to prejudice and confuse the jury." At the limine hearing, the State countered:

The relevance is this, your Honor: That the victim basically had no personal belongings found at the time the apartment is searched. We believe that since we have to prove premeditation, we believe that what was happening is that the defendant had some prior issue with the victim, that he burned his belongings while he was at work.

While this is all going on the victim is at work. They both worked at the same place but they had different shifts. And so from 6:00 in the morning to 3:15 in the afternoon our victim is at—is at work at Oakland Foods. And so we believe that the defendant was burning his personal belongings at that time.

The prosecutor kept explaining:

[Koat] told the police that he burned a shirt or something, one item of clothing of his own, and yet independent witnesses indicated he was burning a lot of stuff. So he's giving, you know, different—other evidence is going to come in to indicate that the story he gave the police was not an accurate one.

The district court accepted that explanation and allowed the State to offer evidence that police and fire officials responded to an open-burn complaint in the alley just after 11:00 a.m. on October 25. They spotted Koat near a smoldering pile of debris and found more ashes inside a nearby dumpster. When Officer Bret Burns asked him why he was burning items rather than just throwing them away, Koat responded: "I don't know." Fast forward to Koat's late November interview with Detective Branigan. Koat said he was burning a sweater he'd been given by an ex-girlfriend. When the detective asked what else he had burned, Koat replied: "Only that one."

In closing, the State mentioned the burning issue in passing, without drawing any conclusions. The prosecutor asked: "And what's going on with this whole incident earlier that morning? And I'm not going to submit to you that we have that answer, all right. What we know factually is that Mr. Koat is burning some stuff outside a dumpster around 11:00 in the morning, right?" Defense

counsel likewise downplayed its importance: "There was no evidence presented that tied that fire to anything in this case."

Without that tie, Koat argues on appeal, that his act of burning clothes before the murder was irrelevant to the issue of who killed Dut. To address that argument, we start with the basics on relevancy. Irrelevant evidence is inadmissible at trial. Iowa R. Evid. 5.402. Iowa courts take "a broad view of relevancy." *State v. Thompson*, 954 N.W.2d 402, 407 (Iowa 2021). Put another way, "[t]he standard of relevance for the admission of evidence generally is not a high bar." *Godfrey v. State*, 962 N.W.2d 84, 119 (Iowa 2021) (Appel, J., concurring in part and dissenting in part). "Evidence is relevant if . . . [i]t has any tendency to make a fact more or less probable than it would be without the evidence" and "[t]he fact is of consequence in determining the action." Iowa R. Evid. 5.401. Whether that "minimum level of logical connection [exists] between the offered evidence and the fact to be proven" lies within the district court's broad discretion. *Thompson*, 954 N.W.2d at 407. We will find an abuse of that discretion only if the court exercises its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable. *Graber*, 616 N.W.2d at 638.

The State identifies two issues of consequence that the fire evidence tended to make more probable: (1) Koat was angry with Dut and burning his clothes on the morning of the murder supported a finding of premeditation and (2) Koat's efforts to conceal the truth about the fire, including telling the detective that he burned a single sweater, underscored the falsity of statements in his third interview, which the jury could interpret as revealing his consciousness of guilt. We agree with that reasoning. Even if the prosecutor miscalculated the probative

value of the burning evidence, it met the low bar for relevance. The court did not abuse its broad discretion in overruling Koat's motion in limine on that point.

Finally, even if the burning evidence were irrelevant to Koat's identity as the killer, its admission was harmless error. Koat's claim fails unless the alleged error affected his substantial rights. *See* Iowa R. Evid. 5.103(a). When, as here, the claimed error is not of constitutional magnitude, we ask whether Koat's rights were injuriously affected by the error or whether he suffered a miscarriage of justice. *See State v. Parker*, 747 N.W.2d 196, 209 (Iowa 2008). As much as the State de-emphasized the burning evidence in its closing argument, we find no harm to Koat's substantial rights.

**AFFIRMED.**