# IN THE COURT OF APPEALS OF IOWA

No. 21-1416
Filed February 22, 2023

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**ROBERT JOSEPH THOMAS,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Marshall County, John J. Haney, Judge.

Robert Joseph Thomas appeals his convictions for first-degree murder and attempted murder. **AFFIRMED.**

Jesse A. Macro Jr. of Macro & Kozlowski, LLP, West Des Moines, for appellant.

Brenna Bird, Attorney General, and Kyle Hanson, Assistant Attorney General, for appellee.

Heard by Bower, C.J., and Vaitheswaran and Tabor, JJ.

**BOWER, Chief Judge.**

Robert Joseph Thomas appeals his convictions for first-degree murder and attempted murder following a bench trial. He asserts there is insufficient evidence he was the perpetrator of the shootings that resulted in injuries to Devonte Brooks and the death of Johnqwez Lewis.[1] Because there is substantial evidence from which a rational factfinder could find Thomas was the perpetrator of the shootings, we affirm.

**I. Background Facts and Proceedings.**

There is no real dispute about the following: On March 15, 2020, Thomas's brother, Blake, was shot to death, and a man named Mustafa Muhammad was arrested for the murder. Johnqwez Lewis was friends with Muhammad, did not believe he was the shooter, and shared "free Mustafa" posts on Facebook angering Thomas. Lewis was married to Reonna Spencer. Devonte Brooks had a child with Alrenae Winfrey, Reonna's sister. Winfrey had been shot in 2019, was paralyzed, and used a wheelchair; she lived around the corner from where Thomas's mother, Rochelle, lived. Brooks and Lewis were "like family," and visited Winfrey's home on Union Street daily.

Viewing the trial evidence in the light most favorable to the State, a rational factfinder could find the following. After Blake's death, Rochelle held a vigil at her house. DaJeane Spencer[2] and her daughters, Reonna and Winfrey, attended the

---

[1] For the remainder of the opinion we will refer to the defendant as Thomas; those who share his last name will be referred to by their first names. Other parties sharing last names, such as the Spencers, will also be referred to by their first names.

[2] DaJeane and Reonna Spencer both described Thomas as their cousin. DaJeane testified Thomas's father is her cousin, so "Robert would be my second cousin."

vigil. While there, DaJeane talked with Thomas. Thomas asked DaJeane "where [Brooks] was" and "whose team he was on." He stated he had spoken to Lewis earlier and their conversation "made him want to shoot [Lewis] in his fucking face." Thomas also asked her if she "knew who family was" and said "he knew three people that would pull the trigger and he was one of them." Thomas also questioned DaJeane about a black car he had seen parked outside of Winfrey's house, suggesting Thomas had been keeping an eye on Winfrey's house.

Days after the vigil, Reonna rode with DaJeane to a convenience store. While she sat in the vehicle waiting for DaJeane, Thomas approached the vehicle and told Reonna he was going to kill Lewis and she should tell "Old Boy" (Brooks) to "watch out."

About 9:00 p.m. on March 25, Brooks was playing cards with Deion Pulling, Lincoln Schossow, and Kevin Lang at Winfrey's house. Lewis called Brooks, saying he was outside. Brooks went out to speak with Lewis, who was parked in the driveway in a black Chevy Malibu. As Brooks came to Lewis's front bumper, a small black SUV approached. Shots were fired from the SUV and hit both Lewis and Brooks; both men fell, and Brooks screamed, "Stop! That's enough." Brooks was hit in the leg and rolled behind Lewis's car, but the shooter got out of the SUV and continued firing at the side of Lewis's car, striking Brooks again. The shooter got back in the SUV, and it sped off. Pulling came outside, removed Brooks's weapons from Brooks's pocket and backpack, and took the weapons inside to await emergency responders.[3] He then dragged Brooks to sit in another car before

---

[3] Brooks had a permit to carry firearms.

police arrived. Lang carried Winfrey out of the house and placed her in the seat next to Brooks while they awaited an ambulance.

Responding police officers found Lewis lying dead in the driveway. Lewis suffered ten entry wounds and eight exit wounds, resulting in damage to his arm, legs, buttock, hip, abdomen, neck, lung, spine, and heart. Brooks had gunshot wounds to his right thigh and ankle; he was transported to the hospital where he remained for a few days.

Police spoke with people at the scene, as well as neighbors on Union Street where the shooting occurred. Investigators collected thirteen shell casings and several bullet fragments from the scene. Subsequent lab analysis proved all thirteen shell casings had been fired by the same unknown rifle. A lab technician test-fired one of Brooks's weapons, but the results were inconclusive, and the casings from the scene did not match the brand or appearance of the ammunition submitted with Brooks's firearm.

After an almost year-long investigation, Thomas was charged with the murder of Lewis and the attempted murder of Brooks.

At trial, David Gomez testified he was five or six houses away from the scene of the shooting. He saw a black SUV. He saw someone shooting who was about the same stature as himself—about five foot, seven inches, weighing 180 pounds—and wearing black.[4] He said he saw the last few gunshots and observed the shooter start to leave, then return to the body and try to drag or carry it for a moment. Gomez testified that he observed the shooter stop trying to drag or carry

---

[4] The presentence investigation described Thomas as of Hispanic descent, five foot, six inches tall and weighing 161 pounds.

the body, put the gun in the rear of the SUV, and close the back door. Gomez described the weapon used as an assault rifle based on the number of shots— more than fifteen—he heard and saw and the fact he has shot similar guns. Gomez also testified he purchased an AK-47 type weapon around the time Lewis was shot.[5] Gomez stated the SUV "kind of peeled out" and turned south on 4th Avenue off of Union. Gomez ran to the scene of the shooting and saw the body on the ground. He indicated he was the first person there.

Gomez also testified that after the shooting he saw a white sedan driving north on 4th Avenue and then turn onto Union Street and park in front of the house next to the scene. He described the driver as a large white male weighing approximately 230 pounds. He indicated the police arrived and a crowd started to gather. Both he and the gentleman in the white sedan talked with law enforcement. Gomez spoke to an officer and told him the color of the vehicle and in which direction it went.

Jake Callaway testified he had been sitting in a white 2015 sedan speaking with his ex-wife in a driveway on Union Street. His car was facing north toward the house. After ten or fifteen minutes of discussion, Callaway observed a black car driving erratically and very fast westbound on Union Street. The car turned into a driveway at the west end of Union Street. Callaway also testified that he observed a white vehicle back out of a driveway near the end of Union Street and drive away slowly. He observed a second black vehicle stop in the street around this same

---

[5] Gomez's weapon was test fired and could not be eliminated as having been used in the shooting, but the ammunition Gomez submitted was not consistent with casings found at the scene.

time. Shortly thereafter he heard gunshots from the west toward the end of Union Street. He pushed his ex-wife down and grabbed a firearm he was licensed to carry. He described hearing sporadic rapid fire shots. Callaway indicated it was "at least a mag . . . about fifteen rounds." He saw the black vehicle in the street taking off to the west and turning south at the end of the street.

Callaway drove around the block to see what was going on after the shooting. He returned to Union Street and parked near the shooting scene. He called 911. Callaway was at the scene for an hour or longer and was interviewed by several law enforcement officers and two DCI agents. After a time, Callaway and his ex-wife drove around the area and talked. About a half block from where they had been parked in the driveway, Callaway saw two individuals that he described as "Hispanic looking." One was walking and the other was riding a bicycle and taking up the opposite lane in the street. Callaway indicated when he was within a few feet of the individuals, the one who was walking and wearing a jersey made a gesture with his hand across his throat. Callaway described this as a threatening gesture that was "awkward and weird."

The following day, Callaway received a Facebook friend request from someone named Sara Rose. Rose ultimately messaged him a phone number and they had a conversation. Rose identified Thomas as her "ex-baby daddy or ex-fiancee" and indicated that they shared a Facebook account. She told Callaway Thomas was the one who sent him the friend request. Rose asked Callaway a lot of questions about what he saw the previous night and what he told the police. After the conversation, Callaway went to Rose's Facebook page and saw a picture

of Thomas, who he recognized as the individual who made the throat cutting gesture on the street the previous night.

Brooks testified he recognized the shooter's black SUV as belonging to "Lala," shown to be Eulalia Salazar. Brooks stated he had seen the vehicle parked on the corner next to the Thomases' house. Police had also seen Thomas driving Salazar's dark-colored Chevy Equinox SUV within days of the shooting.

Salazar testified she met Thomas about a year before the shooting and they saw each other every day after Blake's murder. Salazar stated she leased a charcoal gray Chevy Equinox SUV and she allowed Thomas to drive it. On March 25, Salazar let Thomas drive the Chevy Equinox while she was at work. When Salazar got off work around 4:00 a.m., Thomas and his sister picked Salazar up in the SUV. After dropping off his sister, Thomas directed Salazar to a gravel road by the water works. They stopped by a bridge, Thomas got out of the vehicle holding something in his hand, and then he got back in the car with empty hands. The next morning, Salazar noticed a white residue on the steering wheel and driver's side door—"Like, if you were to clean something, like, with soap." Salazar and Thomas took the SUV to a carwash, and Thomas threw away a bag of belongings he had brought with him.

Marcos Rico testified he was a friend of Blake Thomas and knew Brooks and Lewis, describing Lewis as a "really good guy." Rico attended the vigil for Blake, and while there, Thomas asked him if he knew Lewis. Thomas told Rico he wanted to "smoke him" for "defending this individual that allegedly killed Blake." Rico testified he visited the Thomas house to say a prayer at Blake's memorial after Lewis had been shot, and Thomas stated he "took care of the n****rs."

Thomas told him he had killed Lewis and asked if Rico knew where Brooks was because "he didn't die that night." During a different visit, Rico was drinking with Thomas and other members of the Thomas family, and Thomas gave details about shooting Lewis, admitting he "hopped out and fanned him out." Thomas asked if anyone knew where Brooks was because he wanted to kill him. Rico testified further that at Blake's funeral in June, Thomas placed a pistol on Blake's body in the casket. At Thomas's request, Rico took a photo of the gun on Blake's body and Thomas said, "I took care of him and here's for you, bro."

Mitchell Bostic testified Thomas had sought his help to hire a hitman prior to the March 25 shooting. Bostic testified Thomas visited him at the end of March and told Bostic that "he took care of it himself." Thomas said he "went up on him" and demonstrated by holding his arms as if he were shooting an assault rifle; he seemed pleased and happy, cracking "a little bit of a smile."

After a six-day trial to the court in May 2021, on August 17, the trial court filed its thirty-eight-page written findings of fact, conclusions of law, and verdict. The court made a number of credibility assessments and found Thomas guilty of the first-degree murder of Lewis and the attempted murder of Brooks.

## II. Scope and Standard of Review.

We review challenges to the sufficiency of the evidence for correction of errors at law. *State v. Crawford*, 974 N.W.2d 510, 516 (Iowa 2022). Evidence is sufficient to sustain a verdict if it is "substantial," that is, if the evidence is sufficient to convince a rational trier of fact the defendant is guilty beyond a reasonable doubt. *Id.* "We view the evidence in the light most favorable to the State, including 'legitimate inferences and presumptions that may fairly and reasonably be

deduced from the record evidence.'" *State v. Buman*, 955 N.W.2d 215, 219 (Iowa 2021) (citation omitted).

The court's findings of fact have the effect of a special verdict and are thus binding on appeal if supported by substantial evidence. *State v. Fordyce*, 940 N.W.2d 419, 425 (Iowa 2020). It is not our place "to resolve conflicts in the evidence, to pass upon the credibility of witnesses, to determine the plausibility of explanations, or to weigh the evidence; such matters are for the [factfinder]." *State v. Musser*, 721 N.W.2d 758, 761 (Iowa 2006) (citation omitted). "Direct and circumstantial evidence are equally probative." Iowa R. App. P. 6.904(3)(p).

## III. Discussion.

Thomas contends there is not substantial evidence he was the shooter who killed Lewis and injured Brooks on March 25. He asserts there were no witnesses who identified him, no direct physical evidence he fired a gun, and no fingerprints or DNA evidence connecting him to the gun casings. Thomas notes some witnesses spoke about a white vehicle near the shooting and challenges the State's reliance on circumstantial evidence that a dark SUV was involved in the shooting.

The State responds by pointing out Thomas threatened to kill Lewis and "anybody that is riding with the guy" including Brooks, Thomas was linked to a dark SUV seen at the shooting, and he admitted to several people he killed Lewis. We have already set out some of the evidence presented at the six-day trial. The court began its analysis stating, "The crux of the State's case rests upon the admissions made by [Thomas] to witnesses before and after the events on March 25, 2020." The court then summarized the testimony of numerous witnesses.

The court specifically found DaJeane's testimony about Thomas's threats the night of the vigil "extremely credible." The court also found Reonna's testimony that Thomas threatened to kill Lewis and warned her Brooks should "watch out" was "extremely credible." The court found Rico's testimony about Thomas's threats aimed at Lewis and Brooks "very credible." The court described Bostic's testimony as "compelling and credible for a variety of reasons," which the court then set out. The court found Callaway "had absolutely no reason to manufacture or make up testimony. He testified as to his observations; cooperated with law enforcement; and the court found his testimony credible." As for Gomez, the court found, "Based on the court's review of the offered portions of the body cam video, and the court's observations of Gomez at trial, the court found his testimony very credible." The court also found Salazar's testimony "extremely credible." Finally, the court found Brooks's testimony credible.

The court was not persuaded by the defense's suggestion that the threats Lewis received were from the "Dead Money Gang," finding no credible evidence was presented to make a connection between this gang and the events of March 25. Nor did the court find any credible evidence

> to support that these events were connected to Devonte Brooks or the weapons he possessed at the time of these events; or David Gomez; or the weapon seized and found with his fingerprint or any other unidentified party. Furthermore, nothing in this record would support that these events resulted from a drug deal gone bad, or that Shonnelle Holmes or Irvin Dewalt had anything to do with these events. Finally, the contentions raised by the defense about two white cars in the neighborhood at or around the time of the shooting as possible vehicles involved carries no weight with the court as factfinder. One white car in the area belonged to Lincoln Schossow and another to Jake Callaway. The court found no credible and/or corroborated evidence that would link a white vehicle or driver thereof to this shooting.

There is substantial evidence Thomas repeatedly expressed an intent to kill Lewis and Brooks and that he followed through on that intent. *See State v. Caples*, 857 N.W.2d 641, 646 (Iowa Ct. App. 2014) ("[M]otive evidence is probative of the question of whether the defendant acted with malice aforethought."); *see also State v. Knox,* 18 N.W.2d 716, 724 (Iowa 1945) ("While motive is not an element of a crime and proof thereof is not essential to sustain a conviction, it is of great probative force in determining guilt, especially in cases of circumstantial evidence." (citation omitted)). Thomas's many threats just days before the shooting raise a fair inference he was responsible for the threats to Lewis and that he acted on his expressed intent. After the shooting, Thomas told a number of people that he had killed Lewis and that he was looking for Brooks to kill him as well. The trial court specifically found Rico "testified credibly that [Thomas] admitted to killing Johnqwez Lewis on multiple occasions and that [Thomas] regularly carried guns." The trial court also found "Rico indicated [Thomas] kept asking him if he knew or found out where Devonte Brooks was because he 'wanted to kill him.'" The court also noted that Thomas's cellphone pinged in the area of the shooting on March 25.

Moreover, the court sitting as factfinder found there was credible testimony Thomas had access to and often drove a black SUV belonging to Salazar. Brooks identified the shooter's SUV as belonging to "Lala" Salazar, and he had previously seen it parked near Thomas's house. Police saw Thomas driving Salazar's dark-colored Chevy Equinox SUV just days after the shooting. Salazar spent time with Thomas every day, she allowed him to drive her charcoal gray SUV—including on

the evening of March 25 while she was at work, and Thomas picked her up from work early the next morning in the SUV. This evidence supports a finding he was in the SUV the shooter emerged from and sped off in.

We also note Thomas made a threatening gesture toward Callaway shortly after Callaway finished speaking with police at the scene. When Thomas picked up Salazar from work just hours after the shooting, he directed her to drive to a deserted gravel road where he discarded something by a bridge. And the next day, he went with Salazar to a carwash to clean residue out of the SUV, tossing a bag of belongings in the trash. The factfinder could rationally infer Thomas was hiding evidence that could link him to the shooting. Because the verdict is supported by substantial evidence, we affirm.

**AFFIRMED.**