# IN THE COURT OF APPEALS OF IOWA

———————————

No. 24-1954
Filed May 13, 2026

———————————

**State of Iowa,**
Plaintiff–Appellee,
v.
**Roger Laverne Crews Jr.,**
Defendant–Appellant.

———————————

Appeal from the Iowa District Court for Hancock County,
The Honorable Gregg R. Rosenbladt, Judge.

———————————

**AFFIRMED**

———————————

Alfredo Parrish (argued) and Alexander Smith of Parrish Kruidenier L.L.P.,
Des Moines, attorneys for appellant.

Brenna Bird, Attorney General, and Joseph D. Ferrentino (argued),
Assistant Attorney General, attorneys for appellee.

———————————

Heard at oral argument
by Tabor, C.J., and Badding and Langholz, JJ.
Opinion by Langholz, J.

1

**LANGHOLZ, Judge.**

A jury found Roger Crews Jr. guilty of second-degree murder for killing his estranged wife. He appeals his conviction, challenging only the denial of his motion to suppress incriminating statements that he made to law enforcement officers during two meetings, a month apart. He argues that his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), were violated when, after being given the required warnings, he invoked his right to remain silent and his right to counsel but law enforcement officers still engaged in further interrogation that he did not initiate in both meetings. He also argues that because he did not initiate the second meeting and it was after his arraignment, his constitutional right to counsel was violated.

On our de novo review, we affirm Crews's conviction. The district court correctly denied Crews's motion to suppress the statements he made in the second meeting. As to that meeting, Crews's *Miranda* claim fails because he reinitiated dialogue after invoking his right to counsel and right to remain silent by requesting the meeting with law enforcement officers a month later—and he does not argue that he failed to knowingly and voluntarily waive his rights. His right-to-counsel claim—to the extent that it is properly before us and remains valid under the Iowa Constitution— similarly fails because he initiated that second meeting. We do not decide whether the statements he made in the first meeting after invoking his *Miranda* rights should have been suppressed because any error was harmless given the other overwhelming evidence of his guilt.

## I.   Background Facts and Proceedings

Crews and the victim were married for over thirty years. But their relationship deteriorated, and by 2020 they were living apart. Crews started divorce proceedings in 2023 that were still pending at the time of the victim's

death. And during the separation, Crews lived in various places while the victim and one of their daughters remained in the marital home.

In the summer of 2023—a few months before the murder—the victim reported that Crews burglarized her residence, taking her mail and other personal property, including paperwork related to the divorce. Crews was charged with burglary, and his arraignment was scheduled for late October. The night before the arraignment, he showed up at the victim's house to urge the victim to drop the charges. They went out to eat together. And he stayed overnight, sleeping on a living-room recliner. Their daughter, who would have otherwise been there too, was away on vacation.

The next morning, the victim woke up Crews so he could make it to court on time. Crews continued to beg the victim to drop the charges and to come with him to the arraignment to do so. But she refused and told him to come back after court to tell her how it went.

The arraignment did not go well. Crews appeared irritated, giving "abrupt answers to the judge, not listening, talking at the same time as the judge," causing the judge "to kind of snap at him to pay attention" and repeatedly "admonish[] him not to make any incriminating statements." He "asked for a speedy trial so he thought [the case] was going to be over with that day" and became upset when the judge told him that it would not.

Upon returning to their house, Crews again asked the victim to drop the charges. But she refused and said, "I bet you didn't expect that." He snapped back, saying, "I bet you don't expect this" and punched her in the face, giving her a black eye. She got back up. And Crews repeatedly punched, kicked, stomped on, and strangled her throughout the house—in her bedroom, the hallway, and the living room. He then dragged her through the

kitchen and pushed her down the basement stairs, where her dead body was eventually found.

Soon after, Crews called his girlfriend and left a voicemail exclaiming, "I'm free. I'm finally free." He called her back and told her that he killed the victim. He then came to her house, and she saw that "his hands was full of blood" and "[h]e was all sweaty. His face was red. His hair was plastered to his head. He was shaking and crying." He returned in the wee hours of the morning and then recounted to her in detail what happened at the house and how he killed the victim. He said that when he left the victim, "[s]he was still alive breathing at the bottom of the stairs saying she was going to call the cops on him."

Also late that night, a neighbor spotted a large bonfire on a rural property owned by Crews, burning from about 9:00 p.m. until after midnight. The neighbor's security camera recorded the fire. And investigators later located what appeared to be "two burnt remnants of a pair of shoes" in a burn pit on the property.

The next day, Crews showed up at the southern Minnesota house of a woman who had been helping him with his divorce. Crews was "hysterical" and eventually told the woman that the victim "had came at him and that they had gotten into it." And when she asked if the victim "was okay," Crews "said he didn't know." Crews asked for her advice about what he should do, and she convinced him that they should both go to the local county sheriff's office in Minnesota to report what happened.

At the sheriff's office, Crews met with a deputy in an interview room. He told the deputy that "someone needs to go right away" to their house in Iowa to check on the victim. When the deputy asked if she was okay, Crews

said "that's why I'd like to have her checked on right away." After relaying the information to dispatch, the deputy asked Crews why he thought she was not okay. Crews began to explain about his relationship with the victim, their divorce, his burglary charge, and much of what happened when he was at the victim's house over the past two days. Crews said he did not remember much about their fight except for flashbacks and that "[s]he kept trying to attack me and I fucking pushed her back."

About twenty minutes after Crews entered the interview room, the deputy read him his *Miranda* warnings. Crews confirmed that he understood his rights. And then the deputy asked if he wanted to talk further. Crews first responded, "I'd like somebody to check on her." After the deputy reminded Crews that dispatch had already been told and someone would be doing a welfare check, Crews kept talking further about what happened when he returned from court the day before. Crews again described the victim "yelling and screaming and fucking calling me names like usual" and again said he did not "really remember after that" aside from flashbacks. When the deputy asked Crews if he expected the victim to be okay, Crews responded, "I don't know . . . she was still breathing and mumbling when I left." The deputy talked a bit more with Crews and the woman who had brought him, and Crews apparently waited alone for chunks of time.

Finally, an Iowa Division of Criminal Investigation ("DCI") agent arrived to take over interviewing Crews roughly two hours after Crews had started talking to the deputy. Crews was given a fast-food meal and offered bathroom breaks. The first nearly two hours of the discussion with the agent was nonconfrontational, although Crews often became emotional. He mostly answered general background questions and detailed his grievances with the victim and his family over the past years. But he also gave more details about

his interactions with the victim the night before and morning of her death. He explained that after returning from the court hearing, the victim was yelling at him, got in his face, threw his paperwork on the floor, and shoved him. But he again repeatedly said he did not remember what happened after that aside from "bits of flashbacks." At one point, as the agent pressed Crews about anything he could remember, in tears, Crews exclaimed, "Is she alive? Is she dead? What? I don't know."

Then about an hour and forty-five minutes into the agent's interview, Crews abruptly became enraged by a question about where he had been sleeping. He began yelling and apparently decided he had enough:

> Crews: I'm done here. Give me a fucking lawyer. I'm fucking—this is some fucking sick—I ask you, "Is my wife alright?" I ask you that and you don't even fucking tell me.

> Agent: I'll get to that. I've got some stuff to share with you. I just need—I just need to get some details, okay?

> Crews: And that's what I fucking—that's what I want to fucking know. I'm not fucking talking no more to you at all because that's what I fucking came here to fucking find out.

> Agent: Okay. Alright. Well, I got some things I want to share with you, but I'd like to continue to talk with you.

> Crews: Okay, then you share what you got with me and then I'll listen. I'm done fucking talking. Fucking nobody fucking believes a fucking word I say anyhow, so.

> Agent: Okay. Well, let me take a break here and I'll come back in and I'll share some things with you, okay? Alright? Sound good—take a break?

> Crews: Yeah, yeah, you go out there—

> Agent: Do you—do you need?

Crews: —and conspire with fucking other law enforcement fucking people. That's why you're not fucking man enough to fucking answer my fucking question right there.

Agent: Well, I'll answer your question. Just, I'm trying to—trying to get details.

Crews: That's all I want to know, if she's fucking okay. And you don't wanna fucking tell me. Fuck you, you motherfucker.

Agent: Okay. Okay. Alright. I got some things to share with you, but we're not quite there yet, okay? I've got a lot of questions.

Crews: You might not be there, but I'm there. Put me in the fucking nuthouse where I fucking belong.

Agent: Okay. Alright.

Crews: All I wanted to know. "Oh yeah, go in, tell 'em your story and they'll listen to you. They'll let you know."

Agent: Okay, yeah, I'm here to listen to you, Roger. I'm here to listen, that's why I'm asking questions.

Crews: I'm done talking. I'm done fucking talking. You know what, you're just like everyone else, I'm sure you don't fucking believe a fucking word I'm fucking saying. I'm just a fucking piece of shit like fucking everybody else.

Agent: I didn't say—

Crews: And all I'm fucking guilty of is fucking loving my fucking wife.

Agent: Okay. I'm sorry you feel that way, Roger. But—but uh that's not the case. I didn't say that you were, you know, any of that stuff.

Crews: Well, what the fuck's it matter? What fucking relevance does it have where the fuck I park my fucking truck? I don't get it. I don't understand. What the fuck is that about?

Agent: I'm just trying to understand your situation more. Okay? Alright?

Crews: I've never fucking been violent in my fucking life and they're making me out like a goddamn fucking monster.

Agent: Okay, well I don't think you're a monster. I'm just trying—I'm just trying to get to know you and kind of figure your situation out.

Crews: [mumbling] No, they're gonna throw me to the—fucking through—fucking give me up to some fucking person in the nuthouse and then they can fucking explain it because I can't.

Agent: Okay. You know, Roger, I'm just kinda here to try—

Crews: I'm done. I'm done. I'm done listening. Fucking talking, whatever. I'm through. I can't take more. I can't take no more.

Agent: Okay. Let's take a break. And then, uh—

Crews: Fuck that break. I'm taking a break. Fucking, I shoulda just fucking took care of myself fucking this morning and been fucking—fucking done with it. That's what they fucking made me into. I was a fucking normal person 'til fucking 2020.

Agent: Okay. Well, I don't think you're—I don't think you're a bad guy, Roger. I think you've just fell on some tough times. And everybody has tough times.

Crews: They fucking—they fucking did it to me my fucking wife and fucking kids.

Agent. Sure.

Crews then shared further grievances about friends and family in an extended monologue. After a pause, the agent told Crews he was leaving to use the restroom and asked if Crews wished to do so too. Crews agreed that he would after the agent. Both left the room. And a few minutes later, the conversation resumed:

Agent: Okay, Roger. Anything else you need?

Crews: A psychiatrist.

Agent: Okay. And—

Crews: Someone to tell my problems to.

Agent: Okay, well, I'm here to listen, you know—

Crews: Are you a psychiatrist?

Agent: I am not, but I'm here to listen to you.

Crews: Okay, then that's the fucking answer.

Agent: Okay.

Crews: I'm fucking done talking to you. I don't wanna fucking—I don't wanna hear another fucking word out of you. I just asked one fucking thing and that's what I want to fucking know.

Agent: Okay, well, here you go, Roger—

Crews: She was fucking, she was fucking talking to me and then I fuckin—

Agent: Okay. Here you go. I'm gonna answer your question, Roger, okay? Alright? [The victim] is deceased. Okay?

Crews: In the hall. In the hallway by the fucking bathroom.

Agent: Okay. What can you tell me about her in the hallway by the bathroom?

Crews: I just remember fucking, uh, she fucking uh she hit me with something in the fucking back or something and I think I fucking, I don't know I just I fucking—I just see a fucking picture in my fucking head that I hit her right in the fucking eye with my fist.

Crews and the agent continued to talk for another hour and a half—with about a twenty-minute break a little over an hour into this segment. The agent repeatedly tried to get Crews to describe what happened after Crews punched the victim in the face. But over and over, Crews said that he did not remember, he just had the image in his head of the victim after he punched her, and he was not going to lie about what happened next when he did not know. Crews added that the victim fell to the floor after he hit her, that he was "disgusted" that he did so, and that the victim did not deserve to be hit. The meeting stopped when Crews again said he wanted to get an attorney to

answer his questions about what would happen next. And Crews was eventually charged with first-degree murder and remained in custody at a jail.

About a month later, at the end of November, Crews asked the jail staff if he could meet with "a state law police officer." A different DCI agent—who was the case agent for the murder investigation—came to the jail to speak with Crews. The agent began by explaining to Crews that he was with the Iowa Department of Public Safety and was the case agent investigating the murder of Crews's wife. Crews agreed that he wanted to talk to him. The agent read Crews his *Miranda* rights, and Crews waived them. The agent then gave Crews the floor to talk:

> I'm here to listen to you. And I know you have um it sounds like a bunch of criminal activity you want to talk about? And it sounds like um just a variety of stuff. I'll let you drive the bus then and I'll—whatever you want to talk about I'm here to talk to you.

And Crews talked extensively on a wide range of topics of his choosing, with the agent only offering occasional comments or clarifying questions for an hour and a half. Eventually Crews began talking about the victim's murder unprompted. The officer then began engaging in more active questioning.

Throughout the November meeting, Crews gave much more detail about what happened the night before and day of the murder. While he claimed not to remember actually hitting the victim, he acknowledged that he snapped after she jumped on him and he must have hit her in the eye because he remembered seeing her black eye and he had blood on his hands and glasses. He also recalled seeing the victim crawling down the hallway toward the living room and having to step over her as he carried his things back outside. Crews said that when he left, she "was hurt" and had "blood on her," but "she was still fucking talking." When asked why he did not "call anybody," Crews said it was "because she's going to call the fucking cops."

Crews moved to suppress the statements he made in both the October and November meetings after he invoked his right to counsel as violations of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). He also sought to suppress the statements he made in the November meeting as a violation of his right to counsel. After a hearing, at which the district court heard brief testimony from the DCI agent who met with Crews in November and received audio recordings of both meetings, the court denied Crews's suppression motion.

During the five-day jury trial, the jury watched a four-hour video of the October meeting—showing Crews's entire conversation with the deputy and the agent—a roughly one-hour video of the November meeting—edited to remove some parts of the agent's two-hour interview. Crews did not contest that he killed the victim. Rather, as his attorney said during his closing argument, the case was "all about the why"—as the State sought to prove first-degree murder and Crews argued for second-degree murder, voluntary manslaughter, or involuntary manslaughter. Indeed, his attorney summed up the question before the jury as:

> Where does this land? Because it's one of these. It's either one of the murders or one of the manslaughters. I'm not up here to say he's not guilty of something. He is. But what did they really prove beyond a reasonable doubt? And that's what you're all going to have to decide.

The jury acquitted Crews of first-degree murder but convicted him of second-degree murder under Iowa Code section 707.3 (2023). And the district court imposed an indeterminate fifty-year prison sentence, with a thirty-five-year mandatory minimum.

Crews now appeals his conviction, challenging only the district court's denial of his motion to suppress.

## II.     *Miranda* Violations

In *Miranda v. Arizona*, the United States Supreme Court held that before law enforcement officers question a person who "is taken into custody or otherwise deprived of his freedom by the authorities in any significant way," they must warn the person

> that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966). After giving the warnings, officers may engage in custodial interrogation if the suspect "knowingly and intelligently waive[s] his privilege against self-incrimination and his right to retained or appointed counsel." *Id.* at 475. But if the suspect invokes those rights "at any time prior to or during questioning, . . . the interrogation must cease." *Id.* at 474.

Such an invocation does not mean the interrogation must cease for all time. *See Michigan v. Mosley*, 423 U.S. 96, 102–04 (1975) (addressing additional interrogation after invocation of right to remain silent); *Oregon v. Bradshaw*, 462 U.S. 1039, 1043–45 (1983) (after invocation of right to an attorney). Still, to especially safeguard the right to counsel, when a suspect has invoked that right, further interrogation must cease "until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). And if more interrogation by officers follows the suspect's reinitiation, the totality of the circumstances must show that the suspect knowingly and voluntarily waived his right to counsel and right to remain silent. *See Bradshaw*, 462 U.S. at 1044–45; *see also State v. Lindaman*, 30 N.W.3d 547, 567–68 (Iowa 2025) (discussing and applying the

two-step analysis for deciding whether a suspect's *Miranda* rights were violated after invoking his right to counsel).

Crews argues that these rights were violated when, after being given the *Miranda* warnings, he invoked his right to remain silent and his right to counsel, but law enforcement still engaged in further interrogation that he did not initiate. He thus contends that the district court erred in failing to suppress statements that he made after that invocation of his rights during both the October and November meetings with law enforcement. We review the district court's denial of Crews's suppression motion de novo. *See State v. Park*, 985 N.W.2d 154, 168 (Iowa 2023).

First, we clear some brush. It is uncontested that Crews was in custody for the November meeting, and we assume that he was also for the October meeting.[1] So too is it uncontested that Crews was properly given the *Miranda* warnings at the start of both meetings. And while the State *does* dispute whether Crews unambiguously invoked his right to counsel and right to remain silent during the October meeting, we agree with Crews that he did. About two hours into that meeting, Crews said, "I'm done here. Give me a fucking lawyer." We see nothing ambiguous or equivocal about that clear and

---

[1] While the State argues on appeal—as it did in the district court—that Crews was not in custody, the district court ruled without any analysis that "[t]here was no dispute that [Crews] was in custody at the time of both interviews." And aside from the audio recording of the meeting, there was no evidence presented by either party about the circumstances of that interrogation. Indeed, even the State acknowledges that "[i]t is somewhat unclear if Crews would have been free to leave." Because we lack a reasoned decision of the district court or much evidence on this fact-bound inquiry, we elect not to decide whether Crews was in custody.

colorfully emphatic request to get a lawyer and stop talking.[2] *See State v. Harris*, 741 N.W.2d 1, 6–7 (Iowa 2007).

So we come to the fighting issue on appeal: whether Crews initiated further dialogue that resulted in the statements he now seeks to suppress. To decide whether a suspect initiated further conversation or dialogue, we ask whether his conduct "evinced a willingness and a desire for a generalized discussion about the investigation." *Bradshaw*, 462 U.S. at 1045–46. "There are some inquires, such as a request for a drink of water or a request to use a telephone that are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation." *Id.* at 1045. And so, these "inquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship, will not generally 'initiate' a conversation." *Id.*

Applying this legal standard, the United States Supreme Court held that a suspect's question, "Well, what is going to happen to me now?", was initiation of further dialogue. *Id.* at 1045–46. The court acknowledged the question was "ambiguous," but reasoned "it was not merely a necessary inquiry arising out of the incidents of the custodial relationship" and "could

---

[2] The State contends that Crews's statement becomes ambiguous if we consider its broader context allegedly showing "that it was less of a request for an attorney and more of a negotiation stance taken to get" an answer to his question about his wife's condition. But to reach this conclusion, the State relies mainly on statements made by Crews during the further dialogue after he invoked his *Miranda* rights. That we cannot do. *See Smith v. Illinois*, 469 U.S. 91, 97–100 (1984). To be sure, Crews's conduct after invoking his rights could be considered on the separate questions of whether he reinitiated the conversation and again waived his rights. But "[i]nvocation and waiver are entirely distinct inquiries, and the two must not be blurred by merging them together." *Id.* at 98.

14

reasonably have been interpreted by the officer as relating generally to the investigation." *Id.* at 1046.

Our supreme court similarly held that a suspect reinitiated a dialogue when he responded to officers telling him that they would talk to him if he changed his mind by asking, "You mean talk to you right now instead of . . . what are the options?" and moments later inquiring, "If I talk to you now, . . . I don't have to go to the police station?" *Lindaman*, 30 N.W.3d at 567. The court explained that these "questions about his 'options' and whether talking would change his immediate fate were not routine inquiries about custody; they were questions that evinced a desire to engage in a generalized discussion about the investigation." *Id.* at 568 (cleaned up). And it clarified that the officer's "statement that they would be 'willing to talk' if [the suspect] changed his mind was not interrogation; it was a neutral statement of fact that did not call for an incriminating response." *Id.* So too did our court hold that a suspect reinitiated a dialogue by spontaneously saying, "I know what I did," leading the officer to parrot the statement back in question form as the start of more questioning. *State v. Johnson*, No. 08-0320, 2009 WL 4842480, at *4 (Iowa Ct. App. Dec. 17, 2009).

On the other hand, our supreme court held that a detective—not the suspect—reinitiated dialogue when the suspect began talking again after the detective asked, "You don't trust us enough to do it without a lawyer?" and then said, "And you want to get this behind you." *Harris*, 741 N.W.2d at 7. The court explained that the detective's dialogue "was impermissible because it was 'reasonably likely to elicit an incriminating response.'" *Id.* (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). And our court similarly held that a defendant's comments immediately after invoking his right to counsel—"I just don't want to go to jail anymore" and "I want to set

15

my path right where I belong"—were not reinitiation but rather "the exact opposite," showing that the suspect "wanted an attorney present so he could, in his mind, avoid jail." *State v. Definbaugh*, No. 21-1383, 2022 WL 16985478, at *4–5 (Iowa Ct. App. Nov. 17, 2022). So again, it was the officer who reinitiated interrogation by responding, "Right, I understand. No one wants to go to jail and I'm not saying that's where you are going right now but I do need to cover a few more questions with you, so are you willing to do that with me today?" *Id.* at *4.

*November Meeting.* Applying this precedent here, we consider Crews's second meeting with law enforcement first. And we agree with the State that Crews—not the DCI agent—reinitiated the dialogue.

Over a month after invoking his right to counsel in the October meeting, Crews told staff at the county jail where he was in custody that he wanted to meet with "a state law police officer." When a DCI agent arrived and explained that he was with the Iowa Department of Public Safety and was the case agent investigating the murder of Crews's wife, Crews agreed that he wanted to talk to him. And Crews was again given *Miranda* warnings and expressly waived them at the start of the conversation.

Crews argues that this "was not an expression of desire to speak in a generalized discussion about the investigation, it was an indication that he wanted to speak to them about other crimes." But whatever Crews's original intention, the DCI agent told him that he would let Crews "drive the bus" and "whatever you want to talk about, I'm here to talk to you." Crews then indeed drove the conversation—talking pretty much stream-of-consciousness on a host of topics—with only occasional comments or questions of clarification from the agent. Over the first hour and a half, Crews spoke much about his wife—often breaking down in tears when he brought

16

her up. And it was Crews who started talking about the night of the murder unprompted. Crews's conduct at this second meeting thus also "evinced a willingness and a desire for a generalized discussion about the investigation." *Bradshaw*, 462 U.S. at 1045–46.

So we reject his argument that the DCI agent violated his *Miranda* rights by initiating further interrogation after he had invoked his right. And we thus affirm the district court's denial of his motion to suppress the statements he made in the November meeting on this basis.

*October Meeting.* Whether Crews reinitiated dialogue immediately after invoking his right to counsel in the October meeting presents a closer call. But we need not resolve this question because any error in failing to suppress his statements made in the rest of the October meeting after his invocation was harmless.

"Most federal constitutional errors, including the erroneous admission of evidence in a criminal trial in violation of a defendant's Fifth, Sixth, and Fourteenth Amendment rights, do not require reversal if the error is harmless." *State v. Walls*, 761 N.W.2d 683, 686 (Iowa 2009) (applying harmless-error analysis after holding that *Miranda* rights were violated by officer's failure to cease interrogation when the defendant invoked his right to counsel).[3] "To establish harmless error, the State must prove beyond a

---

[3] Crews argues that harmless-error analysis does not apply here, relying on *State v. Cooley*, in which our supreme court held that "a harmless error analysis cannot be utilized to cure the error incurred by an invalid acceptance of a defendant's waiver of the constitutional right to counsel and the resultant election to proceed with self-representation." 608 N.W.2d 9, 18 (Iowa 2000). But for this *Miranda* violation, *Walls* is directly on point, binding precedent that we must follow rather than flout by extending *Cooley* beyond the "limited class of fundamental constitutional errors [that] defy analysis by harmless error standards." *Id.* at 16.

reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* (cleaned up). In ruling on such a claim, we first consider "what evidence the jury actually considered in reaching its verdict." *Id.* And second, we weigh "the probative force of that evidence against the probative force of the erroneously admitted evidence standing alone" to decide "whether the force of the evidence is so overwhelming as to leave it beyond a reasonable doubt that the verdict resting on that evidence would have been the same without the erroneously admitted evidence." *Id.* at 686–87 (cleaned up).

The State presented much evidence that Crews was guilty of second-degree murder for the jury to consider over the five days of trial. For starters, the jury heard directly from Crews: (1) a recording of his voicemail exclaiming, "I'm free. I'm finally free"; (2) the first two-and-a-half hours of the video of his October meeting with the deputy and DCI agent before invoking his *Miranda* rights; and (3) the hour-long video of his November meeting with the second DCI agent when he detailed even more about what he remembered the morning of the murder. The jury also heard testimony from Crews's girlfriend about his confessions to her that he killed the victim and how it happened in even greater detail than he told the law enforcement officers. The girlfriend explained that after he asked the victim again to drop the charges,

> she said nope, you're on your own and called him a nasty name and said "I bet you didn't expect that," you know. And then he just snapped and he said "I bet you don't expect this," and he punched her in the face and that she fell down, but got right back up, and he said it was mostly punching and kicking. And that he had his hand around her throat for a couple of seconds, but it was mostly just punching and kicking. And then when he left, that she was still breathing, alive on the bottom of the stairs.

And the jury heard from a deputy investigating the case who testified that he reviewed about 875 phone calls Crews made while in jail—a total of 298 hours of calls. The deputy described many of those calls as providing details of the murder, including talking about the victim's black eye, about the victim "running her mouth in the hallway and that is the point where he snapped" and about how "she was going to call the cops." In one phone call, Crews's girlfriend said he "had just broken one of the Ten Commandments and that is Thou Shall Not Kill," and Crews responded, "Yep."

Forensic evidence from the victim's house and her autopsy that corroborated the story Crews told his girlfriend was also presented to the jury in graphic detail. So too was video from a home security camera that showed Crews leaving the victim's house early on the afternoon of the murder. And the jury heard and saw evidence of the bonfire and burnt shoe remnants, suggesting that Crews attempted to destroy the bloody evidence of the murder.

Weighing this overwhelming evidence against the additional statements that Crews made in the October meeting after invoking his *Miranda* rights, we can say "beyond a reasonable doubt that the verdict resting on that evidence would have been the same without" the additional statements. *Walls*, 786 N.W.2d at 686–87 (cleaned up). While the video of the October meeting continued for roughly an hour and a half after Crews invoked his rights, his main additional incriminating statements merely recounted over and over that he punched the victim once in the eye. Despite being pressed repeatedly by the agent for more details, Crews said he did not remember more aside from the victim falling to the ground. He said the same thing plus much more in the November meeting and to his girlfriend on the

day of the murder. Indeed, it was the video of the November meeting that the State played excerpts from in its closing arguments.

Crews has not pointed us to any of his additional statements that he believes could have contributed to the verdict. And on our review, we see none that could have reasonably moved the needle in the State's favor on any element of second-degree murder, especially on the fighting issue of Crews's intent.[4] Again, "[t]his case was tried as a 'whydunit' not a 'whodunit.'" *State v. Caples*, 857 N.W.2d 641, 650 (Iowa Ct. App. 2014). Crews conceded he was guilty of something—but argued for second-degree murder, voluntary manslaughter, or involuntary manslaughter—while the State argued for first-degree murder. And Crews successfully convinced the jury that he did not act "willfully, deliberately, premeditatedly and with a specific intent to kill" the victim, as the jury was instructed the State had to prove for first-degree murder. So in this "context of the case as it was actually tried to this jury," the statements in the post-invocation portion of the October interview "did not reasonably contribute to the verdict."[5] *Id.* Any error in the admission of those statements was thus harmless.

---

[4] The jury was instructed that to find Crews guilty of this offense, the State had to prove three elements: (1) Crews assaulted the victim; (2) the victim "died as a result of being assaulted"; and (3) Crews "acted with malice aforethought" and that if those elements were proved, the jury had to "consider if the act was done solely as a result of sudden, violent and irresistible passion resulting from serious provocation," in which case the defendant would instead be guilty of voluntary manslaughter.

[5] Crews argues that the case might have been tried differently without the additional statements being admitted. Even assuming that is a proper consideration under our harmless-error analysis, *but see Caples*, 857 N.W.2d at 649, we can say beyond a reasonable doubt that the statements are so minimal in comparison to the other evidence that Crews killed the victim that the case would have still focused on Crews's intent.

### III. Right to Counsel under the State and Federal Constitutions

Crews also argues that the district court "committed error by not suppressing the November 30, 2023 interview as violating the right to counsel." (capitalization removed). Yet aside from this conclusory argument in his section heading, Crews makes no argument as to how the November interview violated his right to counsel. He refers to nothing in the record. He merely cites general precedents about the right to counsel without explaining how they should apply here. So it is questionable whether Crews has properly presented this argument for our review. *See* Iowa R. App. P. 6.903(2)(a)(8)(3).

But even generously interpreting his implied argument based on the cases that he cites and his reply to the State's briefing, he appears to merely recast the same argument as he made under *Miranda*: that his right to counsel was violated because law enforcement—rather than Crews—initiated the November meeting. And his argument fares no better here than there.

For starters, no bright-line bar on the initiation of interrogation by law enforcement exists under the Sixth Amendment anymore. *See Montejo v. Louisiana*, 556 U.S. 778, 795–97 (2009) (overruling *Michigan v. Jackson*, 475 U.S. 625 (1986), because its rule was "superfluous" to the protections under *Miranda*); *State v. Camacho*, No. 13-0903, 2014 WL 4628984, at *4–6 (Iowa Ct. App. Sep. 17, 2014) (declining to rely on earlier Iowa precedent interpreting the Sixth Amendment that relied on *Michigan v. Jackson* because it has been overruled).

And to the extent that Crews asserts a claim under article I, section 10, of the Iowa Constitution, his claim fails for the same reason that his *Miranda* claim fails. *See State v. Newsom*, 414 N.W.2d 354, 359 (Iowa 1987) (holding "that our constitution prohibits agents of the State from initiating any conversations or dealings with an accused concerning the criminal charge on

which representation of counsel has been sought" and that "violation of this prohibition by the State shall preclude any waiver, by an accused, of the right to counsel"). He initiated further dialogue by requesting to meet and engaging in a freewheeling discussion of many topics.

We thus affirm the district court's denial of Crews's motion to suppress his statements made in the November meeting on this ground too. And so, we affirm Crews's conviction for second-degree murder.

**AFFIRMED.**